DR. KENNETH P. CARLSON AND MARY JEAN CARLSON, PLAINTIFFS, v. BRANCH
BANKING AND TRUST COMPANY, DEFENDANT

No. COA95-605

(Filed 6 August 1996)

1. **Banks and Other Financial Institutions § 59 (NCI4th)— no
   duty of defendant to monitor use of loan proceeds—no neg-
   ligence by defendant**

   Defendant bank was entitled to a directed verdict in its favor
   as to plaintiffs' claim for negligence where plaintiffs entered into
   an agreement with a third person, based on their own investiga-
   tion and relationship with him, to provide a letter of credit; plain-
   tiffs entered into the arrangement with the third person before
   defendant was approached in regard to financing the acquisition
   of a mutual fund company; after a perfunctory investigation,
   defendant subsequently agreed to provide financing primarily due
   to plaintiffs' letter of credit from another bank; the understanding
   between the other bank's loan officer and defendant's loan officer
   was that the letter of credit was security for funds to be used for
   the mutual fund acquisition; defendant's personnel disbursed
   loan proceeds to the third person without a system to monitor his
   use of the funds; any duty on the part of a commercial lender to a
   guarantor to monitor the use of loan proceeds by a borrower
   must arise through contract; and in the absence of any express
   provision in plaintiffs' letter of credit requiring that defendant
   monitor the use of the loan proceeds to insure their use for the
   intended purpose of the loan, defendant owed plaintiffs no legal
   duty to do so.

   **Am Jur 2d, Banks §§ 683 et seq.**

   **Bank's "reasonable commercial standards" defense
   under UCC sec. 3-419(3). 49 ALR4th 888.**

2. **Fraud, Deceit, and Misrepresentation § 38 (NCI4th);
   Unfair Competition or Trade Practices § 39 (NCI4th)—
   fraud—unfair and deceptive trade practices—directed ver-
   dict for defendant proper**

   The trial court did not err in directing verdicts in favor of
   defendant bank on plaintiffs' claims for fraud and unfair and
   deceptive trade practices, since there was no evidence that
   defendant made any representations to plaintiffs with respect to
   the transaction in question; defendant made no representations

to anyone with respect to the intended purpose of the loan; and there was no evidence to sustain a finding that defendant engaged in conduct which was immoral, unethical, or oppressive, or that it participated with a third person in his deception of plaintiffs.

**Am Jur 2d, Fraud and Deceit §§ 481 et seq.; Monopolies, Restraints of Trade, and Unfair Trade Practices § 735.**

Appeal by defendant from orders and judgment entered 27 September 1994, and from order entered 14 December 1994 by Judge Lester P. Martin, Jr., in Forsyth County Superior Court. Heard in the Court of Appeals 27 February 1996.

*Allman Spry Leggett & Crumpler, P.A., by David C. Smith and Linda L. Helms, for plaintiff-appellees.*

*Moore & Van Allen, PLLC, by Daniel G. Clodfelter and Mary Elizabeth Erwin, for defendant-appellant.*

MARTIN, John C., Judge.

Plaintiffs brought this action against defendant Branch Banking and Trust Company ("BB&T") alleging seven separate claims for relief, including, *inter alia*, claims for breach of contract, negligence, breach of warranty, fraud and deceit, and unfair and deceptive practices in violation of G.S. § 75-1.1. The claims arise in connection with a loan, secured by a letter of credit provided by plaintiffs, made by BB&T to Carolina First Holding Corporation ("Carolina First"). In its answer, defendant BB&T denied the material allegations of the complaint and moved to dismiss each of the plaintiffs' claims.

At a jury trial, the evidence tended to show the following: plaintiff Kenneth Carlson, a retired physician, and his wife, plaintiff Mary Jean Carlson, were approached by David Schamens, a local stockbroker whom plaintiffs had known since Schamens was a young child and with whom they had previously done business, regarding a potential investment opportunity. Schamens was also the sole owner and founder of Carolina First. Schamens represented to plaintiffs that in order to establish Carolina First as a full service financial company, the company had entered into a contract to purchase 80.1 percent of the Ivy Management Company, a mutual fund company in Boston that managed the Ivy Fund. The purchase price of approximately $6.2 million was to be financed in part by bank loans secured by letters of credit. Schamens wanted plaintiffs to provide a $500,000 letter of

credit to help fund the transaction, in return for which plaintiffs would receive 1.8 percent, or 5,000 shares, of the common stock. After the purchase was completed, the bank loans were to be paid back by fees generated by Carolina First, and Carolina First also had an option to buy back plaintiffs' stock, giving plaintiffs approximately a 10 percent return on their investment without the letter of credit ever being drawn upon.

After the initial meeting, plaintiffs considered the proposal and investigated the mutual funds managed by Ivy. Dr. Carlson testified that he kept up with mutual funds "pretty well" by subscribing to investment publications that deal with them, and considered the Ivy Fund to be "an excellent fund." Plaintiffs ultimately decided to invest in the transaction, however, not because they felt they would get a great return on their investment, but because they were primarily interested in helping Schamens with his business. Dr. Carlson described Schamens as being "like a second son."

On or about 10 April 1990, plaintiffs executed a letter of intent with Schamens and entered a more definitive agreement on 1 May 1990 to provide the letter of credit. Plaintiffs understood that the loan was to be used solely for the acquisition of Ivy Management Company, and they had no concern that the funds would be used for anything but the Ivy acquisition. Plaintiffs would not have provided the letter of credit if they thought the funds would be used for some other purpose.

Schamens approached several banks about providing the necessary financing. The 10 April letter of intent indicated that Wachovia Bank, First Union Bank and Southern National Bank ("Southern National") had "preliminarily agreed" to provide loans to finance the Ivy acquisition. Apparently, however, all three banks subsequently decided not to make the loans, though Southern National expressed an interest in serving as the issuer of a letter of credit for the acquisition loan.

In June or early July, Schamens met with Phil Marion and Jim Lewis, commercial lenders at defendant BB&T, and requested defendant to provide a loan for the acquisition. Marion and Lewis felt the loan had a great deal of potential for defendant because Schamens would transfer $100,000 in Master Note investment to defendant upon closing, and the transaction could lead to defendant acquiring deposit accounts from both Carolina First and Ivy. Lewis made, at best, a perfunctory investigation of the transaction documents provided by

CARLSON v. BRANCH BANKING AND TRUST CO.

[123 N.C. App. 306 (1996)]

Schamens, and on 25 July 1990, Lewis recommended to Ernie J. Sewell, defendant's City Executive in Winston-Salem, that defendant make a loan of $425,000 for the Ivy acquisition. Lewis' recommendation noted that Carolina First had experienced quarterly losses in its first six months of operation, and that Schamens' liabilities exceeded his outside total net worth, but also advocated that a $500,000 standby letter of credit from Southern National Bank made the loan worth the documentation risk. A $425,000 loan to fund the Ivy acquisition was approved on 27 July 1990.

During this time, plaintiffs were notified that the Ivy transaction was ready to proceed, and that Schamens had made an arrangement with Southern National regarding the letter of credit. Plaintiffs dealt with Albert Newsome, a vice-president at Southern National in the commercial banking group, who explained to them that Southern National would supply the letter of credit, and that defendant was providing the loan and would be the beneficiary of the letter of credit. For the bank to offer the letter of credit, however, Newsome first asked plaintiffs to establish a banking relationship with Southern National. Plaintiffs and Newsome also discussed that the letter of credit was to be used to secure funds for the acquisition of the Ivy Management Company, and Newsome discussed this with Lewis.

On 26 July 1990, Southern National executed the $500,000 letter of credit on behalf of the Carlsons in favor of defendant to provide Carolina First with financing for the Ivy acquisition. The letter of credit was amended on 1 August 1990 to reflect a delay in the date of the loan. The letter of credit, as amended, provided in pertinent part:

SOUTHERN NATIONAL BANK OF NORTH CAROLINA
Southern International Corp.
P.O. Box 34069, Charlotte, NC 28234, U.S.A.
South College St., 2nd Floor, Charlotte, NC 28202, U.S.A.
Telephone: (704)338-5710 Fax: (704)338-5729

| | |
|---|---|
| IRREVOCABLE STANDBY DOCUMENTARY CREDIT<br>Dated: July 26, 1990 | Credit Number of issuing bank:<br>S-34-71584A |
| Advising Bank | Applicant<br>Dr. and Mrs. Kenneth P. Carlson<br>3108 Buena Vista Road<br>Winston-Salem, NC 27106 |
| Beneficiary<br>Branch Banking & Trust Company<br>Post Office Box 2817<br>Winston-Salem, North Carolina 27102 | Amount<br>FIVE HUNDRED THOUSAND AND No/100<br>U.S. DOLLARS<br>U.S.$500,000.00 |
| | Expires<br>Date: July 16, 1991<br>in Charlotte, North Carolina |

(Credit available by payment at our counters.)

## CARLSON v. BRANCH BANKING AND TRUST CO.

### [123 N.C. App. 306 (1996)]

WE HEREBY OPEN OUR IRREVOCABLE STANDBY DOCUMENTARY CREDIT IN YOUR FAVOR AVAILABLE BY YOUR DRAFT(S) ON US AT SIGHT FOR 100 PERCENT OF DRAWING BEARING THE CLAUSE "DRAWN UNDER SOUTHERN NATIONAL BANK OF NORTH CAROLINA CREDIT NO. S-34-71584A DATED JULY 26, 1990" ACCOMPANIED BY THE FOLLOWING DOCUMENTS:

> A letter purportedly signed by an authorized officer of Branch Banking & Trust Company, Winston-Salem, North Carolina, stating that payment is due under promissory note dated August 2, 1990 in the amount of four hundred twenty-five thousand and no/100 ($425,000.00) U.S. Dollars by and between Carolina First Holding Corporation and Branch Banking and Trust Company.

Special Conditions:
A)   Partial drawings are prohibited.
B)   The original of this credit must accompany your drawing presented to us hereunder.

Except so far as otherwise expressly stated, this documentary credit is subject to the "Uniform Customs and Practice for Documentary Credits" (1983 Revision) International Chamber of Commerce (Publication No. 400).

At the closing on 2 August 1990, after receiving the letter of credit, defendant issued a commitment letter to Carolina First for the $425,000 loan "to fund the costs and expenses related to the acquisition of Ivy Management, Inc.," and Carolina First executed its promissory note to the bank. In addition, Schamens executed a personal guarantee, and his wife, Laura, executed a limited guarantee, of the loan.

Lewis personally disbursed the loan proceeds to a newly opened Carolina First checking account at defendant BB&T as follows: $275,000 on 2 August 1990, done immediately after the closing while Schamens and his wife were still in Lewis' office, from which Lewis wrote a cashier's check for $25,000 to Mrs. Schamens in a transaction designated as a loan; $1,162.50 on 3 August 1990 for the origination fee and legal expenses; $125,000 on 6 August 1990; and $20,000 on 9 August 1990. From the Carolina First account, Lewis or another BB&T employee, at Schamens' request, authorized the transfer of loan funds to other BB&T accounts as follows: on 2 August 1990, $151,282.20 was transferred to an account for Carolina First Securities Group, a subsidiary of Carolina First, and $11,000 was transferred to Schamens' personal investment account; on 3 August, $17,666.49 was transferred to Old South Investment, another company owned by Schamens; on 6 August, another $40,000 was transferred to Schamens' personal investment account, $20,671.23 was transferred to Old South Investment, $23,000 was transferred to an account of Carolina First Asset Management Company, $8,000 was transferred to Carolina First Income Fund, and another $100 was transferred to the Carolina First Asset Management Company account; on 9 August, $20,000 was transferred to an account of

Carolina First Securities; and on 20 August, $500 was transferred to the Carolina First Income Fund account. Checks, debit and credit memos, and histories from these various accounts show that the majority of the loan funds were not used for the Ivy acquisition, and that most of the credited accounts were not mentioned in the Ivy acquisition documents. Indeed, the funds were used for such things as a car for Schamens, construction on Schamens' home, and expenses and reimbursements for Schamens' brokerage company.

Lewis testified that defendant had no system to ensure that the loan funds were being used solely for the Ivy acquisition, but that he had indicated to Schamens the purpose for which defendant BB&T had agreed to make the loan funds available, had incorporated that purpose into the loan agreement, and had "trusted [his] borrower." Lewis testified that Schamens could then use the funds at will. Lewis also testified that Schamens had explained to him that the check to Schamens' wife was to reimburse her for funds she had advanced for the Ivy acquisition.

Unknown to plaintiff or BB&T, the contract for Carolina First to purchase Ivy Management Company had, in fact, become null and void as of 4 June 1990, almost two months prior to the issuing of the letter of credit. On 24 August 1990, the Secretary of State placed Carolina First and its subsidiaries in receivership. On the same date, defendant made demand on Southern National for payment under plaintiffs' letter of credit. Southern National made payment to defendant, and plaintiffs reimbursed Southern National for the amounts paid under the letter of credit.

At the close of plaintiffs' evidence, the trial court granted defendant's motion for a directed verdict as to all plaintiffs' claims except the claims for breach of contract, breach of warranty and negligence. Defendant renewed its motion as to these claims at the close of all the evidence. The trial court deemed plaintiffs' claim for breach of warranty to be the same as their claim for breach of contract, and denied the motion as to the claims for breach of contract and negligence.

The jury returned a verdict finding that a contract existed between plaintiffs and defendant BB&T whereby the loan funds were only to be used for costs and expenses related to the Ivy acquisition, that defendant BB&T had not breached the contract, but that plaintiffs had been damaged by negligence on the part of defendant BB&T, and their damages were $245,000. The trial court entered judgment on

CARLSON v. BRANCH BANKING AND TRUST CO.

[123 N.C. App. 306 (1996)]

the verdict, and denied defendant's subsequent motions for judgment notwithstanding the verdict, or, in the alternative, for a partial new trial. Defendant appeals, and plaintiffs cross-assign error to the trial court's directing verdicts in favor of defendant BB&T as to their claims for fraud and unfair and deceptive practices.

I.

**[1]** The jury found that plaintiffs and defendant BB&T had contracted that the loan funds were to be used only for costs and expenses related to the Ivy acquisition, and that defendant had not breached the contract. However, the jury found that defendant was negligent. Defendant BB&T contends it could not have been negligent because it owed no duty to plaintiffs in connection with the transaction. Thus, defendant contends, the trial court should have granted its motion for directed verdict, or its subsequent motion for judgment notwithstanding the verdict, as to the negligence claim.

A motion for a directed verdict tests the sufficiency of the evidence to submit the case to the jury and to support a verdict in favor of the nonmoving party. *Goodwin v. Investors Life Insurance*, 332 N.C. 326, 419 S.E.2d 766 (1992). A motion for judgment notwithstanding the verdict is essentially a renewal of a motion for a directed verdict, and the test to be applied in determining the sufficiency of the evidence is the same for either motion: the nonmovant's evidence must be taken as true and must be considered in the light most favorable to the nonmovant. *Bryant v. Nationwide Mut. Fire Ins. Co.*, 313 N.C. 362, 329 S.E.2d 333 (1985); *Tate v. Christy*, 114 N.C. App. 45, 440 S.E.2d 858 (1994).

Negligence is a failure to exercise proper care in the performance of some legal duty owed by a defendant to a plaintiff under the circumstances. *Mattingly v. R.R.*, 253 N.C. 746, 117 S.E.2d 844 (1961). Thus, for plaintiffs to recover on a theory of negligence, they must first show the existence of a legal duty owed to them by defendant. "A failure to perform a contractual obligation is never a tort unless such nonperformance is also the omission of a legal duty." *Toone v. Adams*, 262 N.C. 403, 407, 137 S.E.2d 132, 135 (1964).

Plaintiffs contend defendant BB&T owed them a legal duty to monitor the loan proceeds to see that they were used for the Ivy acquisition because defendant, in relying on plaintiffs' letter of credit, understood such use was the only intended purpose for which plaintiffs provided the letter of credit. Plaintiffs contend that such a duty

CARLSON v. BRANCH BANKING AND TRUST CO.

[123 N.C. App. 306 (1996)]

is "well-grounded" in the common law, and presented expert opinion testimony to the effect that generally accepted banking standards and defendant's own internal procedures required that defendant monitor the loan proceeds and that defendant had failed to do so.

"When there is no dispute as to the facts . . . the issue of whether a duty exists is a question of law for the court." *Mozingo v. Pitt County Memorial Hospital*, 101 N.C. App. 578, 400 S.E.2d 747 (1991), *affirmed*, 331 N.C. 182, 415 S.E.2d 341 (1992). *See also* Restatement (Second) of Torts § 328(b) (1965) (in negligence action, court must determine whether the facts "give rise to any legal duty"). Thus, the dispositive issue is whether defendant had a legal duty to monitor the disbursement of the loan proceeds for plaintiffs' benefit to see that Schamens used the funds only for the Ivy acquisition. We hold that no such duty arose upon the facts of this case.

Considered in the light most favorable to plaintiffs, the evidence shows plaintiffs entered into an agreement with Schamens, based on their own investigation and relationship with him, to provide the letter of credit. Plaintiffs entered into the arrangement with Schamens before defendant was approached in regard to financing the Ivy acquisition. After a perfunctory investigation, defendant subsequently agreed to provide financing primarily due to plaintiffs' letter of credit from Southern National. The understanding between plaintiffs and Southern National's Albert Newsome, and between Newsome and defendant BB&T's loan officer, Jim Lewis, was that the letter of credit was security for funds to be used for the Ivy acquisition. Lewis, or other BB&T personnel familiar with the transaction, disbursed loan proceeds to Schamens without a system to monitor his use of the funds, and, indeed, when there were indications that he may have been using the funds for purposes unrelated to the Ivy transaction.

Generally, in disbursing a loan:

[a] bank must make such application of the proceeds . . . as is agreed upon in the contract between it and the borrower, and is liable for a failure to do so. Ordinarily, under the contract of loan, the bank is to turn the proceeds over to the borrower or his order; and, if such application is made, the bank has fulfilled its part of the contract, and it is not liable for further disposition of the fund.

9 C.J.S. *Banks and Banking* § 395 (1938 & Supp. 1995). In this case, defendant applied the proceeds as had been agreed between it and its borrower, Carolina First. Though the statement of purpose in the loan

agreement between defendant and Carolina First indicated that the loan was "to fund the cost and expenses related to the acquisition of Ivy Management, Inc.," this Court has previously held that such purpose statements are permissive and merely describe what the borrower may do with the money rather than giving rise to a lender's affirmative duty to a third party. *Cartwood Construction v. Wachovia Bank & Trust Co.*, 84 N.C. App. 245, 352 S.E.2d 241, *affirmed*, 320 N.C. 164, 357 S.E.2d 373 (1987).

Plaintiffs have cited no cases from North Carolina recognizing the existence of the duty they claim in this case. However, in arguing that such a duty is "well-grounded" in the common law, plaintiffs direct us to cases in similar contexts from other jurisdictions. *See Fikes v. First Federal Sav. and Loan Ass'n.*, 533 P.2d 251 (Alaska 1975); *Burkons v. Ticor Title Ins. Co.*, 813 P.2d 710 (Ariz. 1991); *Dickens v. First American Title Ins. Co.*, 784 P.2d 717 (Ariz. App. 1989); *Glencoe State Bank v. Cole*, 265 Ill. App. 158 (1932); *Peoples Bank & Trust Co. v. L & T Developers, Inc.*, 434 So. 2d 699 (Miss. 1983); *Home Federal Sav. and Loan Ass'n. v. Depass*, 340 S.E.2d 545 (S.C. 1986). We first note that each of the cases cited by plaintiffs involve construction lending rather than commercial lending which, while certainly not dispositive, may more easily permit monitoring through on-site inspections. *See Peoples Bank & Trust Co. v. L & T Developers, Inc.*, 434 So.2d 699 (Miss. 1983). Moreover, the existence of an implied duty on the part of a lender to a guarantor to monitor the borrower's use of loan proceeds is far from universally recognized. *See, e.g., Light v. Equitable Mortgage Resources, Inc.*, 383 S.E.2d 142 (Ga. App. 1989) (holding that where lender undertook no duties for the benefit of guarantors, lender owed guarantors no duty with regard to disbursement of construction loan proceeds to developer). Indeed, *Glencoe State Bank v. Cole*, 265 Ill. App. 158 (1932), cited by plaintiffs in support of their argument, has been disavowed by a federal district court which predicted it to be "extremely unlikely that the Illinois Supreme Court would adopt . . . the implied duty recognized in the *Glencoe* court's depression-era ruling." *Home Sav. Ass'n of Kansas City v. State Bank*, 763 F. Supp. 292, 298 (N.D. Ill. 1991). The federal district court stated:

[w]ere the Illinois Supreme Court to adopt the holding of the *Glencoe* court today, it would stand solidly in the minority of jurisdictions that have addressed the issue. As these other courts have held:

Where there is an agreement subordinating a subsequent lien for purposes of a construction loan, in the absence of an *express covenant* from the subsequent lienor to the prior lienor to see to the application of the sums advanced, the diversion of funds on the part of the mortgagor is a risk run by the prior lienor unless he is able to demonstrate collusion between the mortgagor and the subsequent lienor.

*Id.* (quoting *Hyatt v. Maryland Fed. Sav. & Loan Ass'n*, 42 Md.App. 623, 402 A.2d 118, 122 (1979) (emphasis added)) (citing *Big Land Invest. Corp. v. Lomas & Nettleton Financial Corp.*, 657 P.2d 837, 843 (Alaska 1983); *People's Bank & Trust Co. v. Rocky Mountain, Etc.*, 620 P.2d 58 (Colo. App. 1980); *First Connecticut Small Business Invest. Co. v. Arba, Inc.*, 170 Conn. 168, 365 A.2d 100, 104 (1976); *Indiana Mortgage & Realty Investors v. Peacock Constr. Co.*, 348 So. 2d 59 (Fla. App.), *cert. denied*, 353 So. 2d 677 (Fla. 1977); *Provident Fed. Sav. & Loan Ass'n v. Idaho Land Developers, Inc.*, 114 Idaho 453, 757 P.2d 716 (App. 1988); *Rockhill v. United States*, 288 Md. 237, 418 A.2d 197, 204 (1980); *Tuscarora, Inc. v. B.V.A. Credit Corp.*, 218 Va. 849, 241 S.E.2d 778 (1978)).

In our view, any duty on the part of a commercial lender to a guarantor to monitor the use of loan proceeds by a borrower, must arise through contract. *See Sunset Investments, Ltd. v. Sargent*, 52 N.C. App. 284, 278 S.E.2d 558, *disc. review denied*, 303 N.C. 550, 281 S.E.2d 401 (1981) (holding that a party providing a letter of credit "fails at its peril" to include in the letter language restricting honor and payment of the credit). In the absence of any express provision in plaintiffs' letter of credit requiring that defendant BB&T monitor the use made by Carolina First and Schamens of the loan proceeds to assure their use for the intended purpose of the loan, defendant owed plaintiffs no legal duty to do so. In the absence of such a duty, there can be no claim for negligence. Accordingly, defendant was entitled to a directed verdict in its favor as to plaintiffs' claim for negligence, and the judgment entered on the jury's verdict must be reversed.

II.

[2] Plaintiffs cross-assign as error the trial court's granting of directed verdicts in favor of defendant as to their claims for fraud and unfair and deceptive practices. We find no error in these rulings by the trial court.

Our Supreme Court has defined the essential elements of fraud as follows:

[P]laintiff must show: (a) that the defendant made a representation relating to some material past or existing fact; (b) that the representation was false; (c) that when he made it defendant knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (d) that the defendant made the false representation with the intention that it should be acted on by the plaintiff; (e) that the plaintiff reasonably relied upon the representation and acted upon it; and (f) that the plaintiff suffered injury.

*Odom v. Little Rock & I-85 Corp.*, 299 N.C. 86, 91-92, 261 S.E.2d 99, 103 (1980). *See Myers & Chapman, Inc., v. Thomas G. Evans, Inc.*, 323 N.C. 559, 568, 374 S.E.2d 385, 391 (1988), *reh'g denied*, 324 N.C. 117, 377 S.E.2d 235 (1989). There is no evidence in the record before us sufficient to sustain a verdict in favor of plaintiffs on their claim of fraud. Defendant made no representations to plaintiffs with respect to the transaction; its dealings concerning the letter of credit were solely with Mr. Newsome of Southern National. Moreover, defendant made no representations to Newsome with respect to the intended purpose of the loan; the understandings of all of the parties were based on Schamens' representations as to the purpose of the loan.

Under G.S. § 75-1.1, a "practice is unfair if it offends established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, (citation omitted)" and "is considered deceptive if it has the capacity or tendency to deceive." *Wachovia Bank & Trust Co. v. Carrington Development Assoc.*, 119 N.C. App. 480, 487, 459 S.E.2d 17, 21 (1995). There is no evidence in this case to sustain a finding that defendant BB&T engaged in conduct which was immoral, unethical, or oppressive, or that it participated with Schamens in his deception of plaintiffs. Accordingly, plaintiffs' cross-assignments of error are overruled. *Arnold v. Sharpe*, 296 N.C. 533, 251 S.E.2d 452 (1979).

The judgment from which defendant appeals must be reversed and this case remanded for the entry of judgment dismissing plaintiffs' claims.

Reversed and remanded.

Judges JOHNSON and McGEE concur.