STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
FORSYTH COUNTY                   SUPERIOR COURT DIVISION
                                     96 CvS 1409

PHILIP A.R. STATON,
Plaintiff,

And

INGEBORG STATON AND MERCEDES STATON, INDIVIDUALLY AND AS TRUSTEES OF THEIR
RESPECTIVE REVOCABLE LIVING TRUSTS,
Plaintiffs and Third-Party Plaintiffs,

And

CENTURA BANK,

Defendant and Third-Party Plaintiff

v.

THOMAS BRAME, JERRI BRAME, JERRI BRAME d/b/a T & J VENTURES, T & J VENTURES, INC.,
S&B INVESTMENTS, JRB INVESTMENTS, JRB INVESTMENTS, INC., GLOBAL SPORTS
MANAGEMENT CO., GLOBAL LAND MANAGEMENT, INC., and DARRELL WILSON,
Defendants, Cross- Claimants and Third-Party Defendants,

And

CENTURA BANK, DANNY WRENN, GEORGE R. JARVIS, POYNER & SPRUILL, POYNER&
SPRUILL, L.L.P., CURTIS TWIDDY, ESQ., and CORNELIUS COGHILL, ESQ.,
Defendants and Third-Party Defendants,

And

PHILIP A.R. STATON, JERRI R. BRAME, PHILLIP A.R. STATON, ACTING TRUSTEE OF STATON
FOUNDATION DECLARATION OF THE TRUST DATED DECEMBER 6, 1993, ALL UNKNOWN AND
UNASCERTAINED HEIRS OF THE ESTATE OF PHILIP A.R.STATON, INGEBORG E. STATON,
BENEFICIARY OF THE INGEBORG E. STATON REVOCABLE LIVING TRUST DATED NOVEMBER
3, 1993, EDUARDO ARBOLEDA, MINOR CHILD OF INGEBORG E. STATON, VIVIANA ARBOLEDA,
MINOR CHILD OF INGEBORG E.  STATON, ROBERTO ARBOLEDA, MINOR CHILD OF INGEBORG
E. STATON, ALL UNKNOWN AND UNASCERTAINED HEIRS OF THE ESTATE OF INGEBORG E.
STATON, and MICHAEL F. EASLEY, ATTORNEY GENERAL OF THE STATE OF NORTH
CAROLINA,
Third-Party Defendants.


STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
FORSYTH COUNTY                   SUPERIOR COURT DIVISION
                                     96 CvS 7140

PIEDMONT INSTITUTE OF PAIN MANAGEMENT, T. STUART MELOY, NANCY I. FALLER,
D.O. AND WILLIAM JOSEPH MARTIN, D.O.
Plaintiffs,

v.

## ORDER and OPINION

{1}    THIS MATTER comes to the Court on motions for summary judgment filed by the following parties:  Centura Bank ("Centura"); Poyner & Spruill ("P&S"); Philip Staton ( "Philip"); and Ingeborg Staton ("Inge"), The  1991 Revocable Living Trust of Ingeborg Staton, Mercedes Staton ("Mercedes") and The 1983 Revocable Living Trust of Mercedes Staton (collectively, "Inge and Mercedes").  The summary judgment motions are asserted against claims filed by the Piedmont Institute of Pain Management ("PIPM"), Dr. Stuart Meloy, Dr. Joseph Martin and Dr. Nancy Faller (the "Doctors").  For the reasons detailed below, the various summary judgment motions are granted in part and denied in part.

{2}    Also before the Court are PIPM's and the Doctors' motions for summary judgment against Inge and Mercedes Staton.  Those motions are granted.

{3}    The Court previously entered a "Notice of Preliminary Summary Judgment Decisions" because these consolidated cases were set for trial and the parties needed to know what issues survived summary judgment before the Court could complete this extensive order.  After notice was given, trial began of the remaining claims that the Statons, individually and as trustees, asserted against Centura, P&S, Tom Brame, and Jerri Brame.  After five weeks of trial and before jury verdict all claims between those litigants were resolved or dismissed.  Therefore, this order will not deal with issues between those parties represented at trial and otherwise addressed in the "Notice of Preliminary Summary Judgment Decisions." This order will deal solely with the remaining issues between PIPM, the Doctors and the other litigants.

## I.
### Undisputed Facts

{4}    Philip met Tom Brame ("Tom") in 1986. Tom was married to Jerri Russell Brame ("Jerri") (collectively, "Brames") in April 1988. Tom's wife, Jerri, and Philip's wife, Gayle, are sisters. Tom, therefore, was Philip's brother-in-law.  Inge is Philip's sister and Mercedes is his stepmother.  Inge and Mercedes live in Colombia, South America.  Inge and Philip have dual U.S. and Colombian citizenship; Mercedes is not a U.S. citizen.  Tom and Jerri are now divorced and Tom has asserted his Fifth Amendment privilege refusing to testify in these cases.

{5}    Beginning in or about 1988, the Brames  assisted Philip, Inge and Mercedes, (collectively, "Statons") with asset administration and security management.

{6}    In the late 1980s, the Statons inherited a significant block of stock in the Pan American Beverage Company ("Panamco"), a holding company for certain subsidiary companies that bottled and distributed Coca-Cola products in Mexico and South America.  Albert Staton, Inge and Philip's father, founded Panamco.

{7}    Inge is the settlor, trustee and beneficiary of the Revocable Living Trust of Ingeborg E. Staton dated January 10, 1991 ("Inge's Revocable Trust"). On January 10, 1991, Inge named Philip a co-trustee of this trust.  Philip served as trustee continuously until March 15, 1996, when Inge revoked all of Philip's powers as trustee.

{8}    Mercedes is the settlor, trustee and a beneficiary of the Mercedes Mesa de Staton Revocable Trust dated October 20, 1983 ("Mercedes' Revocable Trust"). On September 24, 1992, Mercedes appointed Philip as co-trustee of her Trust. Philip served as trustee continuously until March 15, 1996, when

Mercedes revoked all of Philip's powers as trustee.

{9}    On December 13, 1988, the Statons signed a Memorandum of Understanding that delegated to Tom and other parties the authority and responsibility for handling specific areas of their affairs. Charles Hirsh, an accountant in Miami, Florida was designated accountant for the Statons under the Memorandum of Understanding.

{10}    On April 1, 1991, Philip signed an Appointment of Agent appointing Tom, Jerri and their company T&J Ventures ("T&J") as his agents to act on his behalf as trustee of Inge's Revocable Trust. Inge learned of this appointment within weeks after its execution and did not object to it.

{11}    On November 1, 1991, Philip and his wife, Gayle, each executed an Appointment of Agent and Power of Attorney ("1991 Powers") to the Brames and their company T&J. The power states: "I, [], do hereby appoint T&J Ventures, Tom or Jerri Brame, as my agent with the power to act in my name, place and stead in any way which I myself could do if I were personally present with respect to all financial matters and endorsements." The power of attorney was signed in Fairfax County, Virginia.

{12}    On March 13, 1992, Inge and Mercedes each executed a General Power of Attorney ("1992 Powers") appointing Philip as their attorney-in-fact "with full power of substitution." In September 1992, Inge and Mercedes each executed another General Power of Attorney, virtually identical to the ones of March 13, 1992, appointing Philip as their attorney-in-fact in their capacity as trustees of their respective Revocable Living Trusts. These powers signed in Florida provide:

> . . .
>
> 1. I hereby give and grant unto my attorney-in-fact full power and authority generally to manage and attend to all of [my] affairs, interest and property of every kind and description, real, personal, or mixed, and wherever located. The specific powers of my attorney-in-fact as set herein are not meant to be exclusive or to limit the generality of his power, authority, and discretion to perform any and all acts of whatever kind necessary to be done in managing and attending to all of the affairs, interests and property of [undersigned], as aforesaid, in the manner and to the same extent as I myself might or could do if I were personally present.

The seven-page power goes on to enumerate sixteen separate broadly drawn powers, including the power "to effect all transactions in his name as attorney-in-fact, in my name, or the Trust's name, or in the name of any nominee of the attorney-in-fact." Philip held powers of attorney from Inge and Mercedes both in their individual capacities and in their capacities as trustees for their trusts. Thus, while Philip was co-trustee of both of their trusts, he also held a power of attorney from each of them as trustee of their own trusts.

{13}    On August 12, 1992, the Statons signed an agreement with a broker who specialized in the sale of family interests in Coca-Cola distributorships, thereby authorizing him to sell the Statons' stock in Panamco. The Statons referred to themselves as the "PIM Group." Philip intentionally withheld the names of the sellers of the stock for security reasons. Wealthy people are frequently targets of kidnappers in Colombia, South America.

{14}    On June 8, 1993, the Statons entered into a Purchase Agreement to sell their stock in Panamco. On this same date, Inge and Mercedes executed an Appointment of Sellers' Agent ("1993 Sellers'Agent") appointing Philip as the true and lawful agent of all in regard to the sale. Relevant portions of the document read as follows:

> Each Seller hereby irrevocably constitutes and appoints Stockholder A [Philip] as the true and lawful agent ("Seller's Agent") of such Seller with full powers of substitution to act in the name, place and stead of such Seller with respect to the transfer of such Seller's equity interests in the Buyer and Other Interests to the Buyer or Escrow Agent in accordance with the

terms and provisions of the Purchase Agreement and to do or refrain from doing all such further acts and things, and to execute all such documents, as such Sellers' Agent shall deem necessary in connection with any of the transactions contemplated under the Purchase Agreement, including, without limitation, the power:

. . .

5. to receive and issue receipt for funds;

. . .

7. . . . and to deposit the same in any banking institution or investment which the Sellers' Agent deems prudent under the circumstances on behalf of the Sellers;

8. to do or refrain from doing any further act or deed on behalf of the Sellers which the Sellers' Agent deems necessary or appropriate in his sole discretion relating to the subject matter of the Purchase Agreement. . . .

. . .

This Appointment of Sellers' Agent shall be deemed coupled with an interest and shall be irrevocable and the Buyer and Escrow Agent, and any other person may conclusively and absolutely rely, without inquiry, upon any action of the Sellers' Agent as the action of the Sellers in all matters referred to in the Purchase Agreement, the Escrow Agreement and any other Agreement. . . . [T]he Sellers' Agent shall not be responsible to any Seller for any loss or damage any Seller may suffer by reason of the performance by the Seller's Agent of his duties under this Appointment, other than loss or damage arising from willful violation of law or gross negligence in the performance of his duties under this Appointment.

{15} Philip believed this document gave him authority to act on behalf of Inge and Mercedes regarding the sale proceeds and to transfer all the money to Centura.

{16} In 1993 the Statons were negotiating the sale of their Panamco stock. A letter from Philip to Tom on May 8, 1993, reveals that Philip was concerned about endangering the lives of Inge and Mercedes if the transaction was not handled appropriately.

{17} On June 25, 1993, Philip executed a Power of Attorney and Appointment of Agent naming T&J and the Brames as his agents to act in his place and stead "with particular regard to the receipt and disbursement of funds to be wired to Centura Bank on my behalf." Philip believed he had the ability to give Tom the authority to disburse and or invest all of the funds.

{18} On June 28, 1993, the Brames opened the PIM Group Clearing Account ("PIM Account") for the receipt of the Pananoco funds at Centura in Winston-Salem, North Carolina. The account was opened in such a manner that only the Brames had signature authority over the account. The Brames identified the Statons as the true owners of the account to Centura officials.

{19} The proceeds from the stock sale were initially deposited into an escrow account at Sun Bank in Miami, Florida. In a letter dated July 15, 1993, Philip told Tom that he would fax wire instructions to Jodi Kalter at Sun Bank by the following day. The wire instructions to Sun Bank in Miami dated July 16, 1993, included the name of the bank in which the funds were to be transferred, the account number, the account name (PIM Group Clearing Account) and Philip's signature. Earlier correspondence reveals that Philip did not provide Sun Bank with complete wiring instructions at an earlier time because he did not want Panamco to have advance access to such information.

{20} Included in Philip's letter to Tom on July 15, 1993, was a table titled "Wire Transfer and Interest

Allocation Schedule." The table reveals the allocations of the gross amount of $118,463,177.28 among Stockholders A, B and C. The proceeds were roughly divided so that 22 percent was allocated to Stockholder C (Mercedes), 38 percent to Stockholder B (Inge) and 38 percent to Stockholder A (Philip). This allocation schedule was not provided to Centura. Philip intended that the stock proceeds remain in the PIM account until tax payments and some other expenses were paid.

{21} Conversely, in his deposition Philip claimed that the money was to be divided thus: 38 percent to Stockholder A (Philip), 38 percent to Stockholder B's Trust (Inge's Revocable Trust) and 22 percent to Stockholder C's Trust (Mercedes' Revocable Trust). The "Trust" designations are not on the Wire Transfer and Interest Allocation Schedule. The majority of the stock belonged to Inge and Mercedes' Revocable Trusts, not to them individually. Inge and Mercedes agree that the majority of the transaction proceeds belonged to their Revocable Trusts.

{22} On July 16, 1993, proceeds of the Panamco stock sale totaling $118,784,785.94 were wired to Centura from Sun Bank in Miami, Florida; Philip was aware on that date that the funds had in fact been received by Centura and that the funds were placed into one account at Centura. The wiring receipt retained by Centura contained the name and phone number of Philip Staton.

{23} On July 29, 1993, Philip faxed the Bank of New York wiring instructions for additional stock proceeds of the Panamco stock. The wire instructions provided to the Bank of New York were materially similar to the instructions provided Sun Bank in Miami, Florida, in that the instructions included the name of the bank to which the funds were to be transferred, the account number, the account name (PIM Group Clearing Account) and Philip's signature. However, these wiring instructions included the contact name and phone number of Philip Staton. On July 30, 1993, additional proceeds of the stock sale totaling $676,938.16 were wired; Philip was aware on that date that Centura had in fact received the funds and that the funds were placed into one account at Centura.

{24} Tom had given Centura the impression that a small percentage of the funds belonged to him, but Centura was aware that the bulk of the funds belonged to the Statons and that the Brames acted as agents for the Statons.

{25} Following the deposit into the PIM account, the Brames continued to withdraw, deposit and transfer funds in the PIM account as well as open and close accounts at Centura. As a result of the Brames' management of these various accounts, tens of millions of dollars were lost, and substantial sums were transferred by the Brames for their own benefit.

{26} All the approximately $119 million wired to and received by Centura was deposited into the PIM Account, and Philip claims he gave instructions to the Brames to invest the money initially in T-bills or treasury securities, or in other things that were "fairly safe and low risk." Further, Philip "intended that the funds would be deposited into a temporary account at Centura pending a determination and payment of certain rather large estimated tax obligations, coming due within a few months of the sale, at most, and that shortly thereafter the remaining funds in the account would be disbursed among the three Statons in their respective ownership percentages according to the allocation schedule that had been provided to the Brames by Philip." (Pl. Philip Staton Counterstatement of Facts, at 8.) Philip never conveyed this information to Centura.

{27} Inge and Mercedes knew that Philip provided the Brames authority to pay their bills and manage the investing of the PIM funds. Inge and Mercedes trusted Philip completely and were aware, but did not approve, of his degree of trust in Tom.

{28} The Brames received all relevant documentation related to the accounts at Centura. The Statons knew the location of these files containing the documentation but did not review the information until after January 1996 – two and a half years after the initial transfer.

{29} Tom met Dr. Stuart Meloy ("Meloy"), an anesthesiologist, in 1990. At that time, Tom discussed

with Meloy the idea of opening a pain clinic. Tom had bypass surgery twice in 1992 and was treated by Meloy for pain.  In August 1993, Tom told Meloy that he (Tom) had clients who wanted to shelter money and that Meloy should set up the pain clinic. Meloy contacted Dr. Joseph Martin ("Martin"), with whom he had worked as a resident, to discuss organizing such a clinic.  Martin drafted a proposal for the clinic and sent it to Tom in September 1993.

{30}    The proposal called for a clinic with a staff of three physician-directors.  The "director" was to be Meloy. The two "associate directors" were to be Martin and Dr. Nancy Faller ("Faller"). Faller was and still is the wife of Martin.  At the time, both Martin and Faller held academic positions in South Carolina.

{31}    On November 1, 1993, Dan Wrenn ("Wrenn"), a trust officer at Centura, met with the Brames and two other Centura officers, Dick Jarvis ("Jarvis") and Dennis Bellefeuille, about creating a charitable trust and a foundation.  Jarvis told Wrenn that the Brames had the authority to disburse funds from the PIM account and that he (Jarvis) would forward the Brames' powers of attorney to Wrenn.

{32}    P&S was selected to prepare documents to establish charitable lead trusts ("CLTs") for Inge and Philip, a foundation called the Staton Foundation ("Foundation") that would be funded with income from the CLTs, and the Piedmont Institute of Pain Management ("PIPM") as beneficiary of the Foundation.  At the time Centura was one of the largest clients of P&S.

{33}    In preparation for setting up the CLTs and Foundation,  P&S questioned whether the existing powers were sufficient to create a gift and  drafted new powers for the Statons to sign that specifically authorized charitable gifts.

{34}    On November 3, 1993, before the execution of the documents creating the Foundation, Tom transferred $2 million from the PIM Account into an account at Centura in the name of the Foundation.

{35}    On November 24, 1993, Philip signed the 1993 Durable Power of Attorney that appointed Tom as Philip's attorney-in-fact.  Philip also signed the Durable Powers drafted for Inge and Mercedes' signatures. On the line designated for Inge's signature, he wrote out "Inge E. Staton, by," and below it, "/s/ Philip A.R. Staton, Attorney-in-fact."  He signed Mercedes' Durable Power in the same manner in which he signed Inge's: "Mercedes Staton, by" on the signature line, and "/s/ Philip A.R. Staton, Attorney-in-Fact" below it.   P&S had specifically instructed Centura and the Brames to have the principals sign the powers personally before any funds were transferred.

{36}    Philip has acknowledged signing all three Durable Powers. As to Inge's 1993 Durable Power, Philip believed he was authorized to sign it based on the 1992 powers of attorney she had given him, the Agreement of Sellers' Agent, and "the general instruction [he] had from her to try to make sure that her affairs were properly managed in the United States."  Likewise, Philip testified he believed he was authorized to sign Mercedes' 1993 Durable Power.

{37}    On December 6, 1993, the Doctors executed a conflicts waiver letter generated by P&S.  The letter was addressed to Philip, Inge, the Doctors and Centura. It set forth four tasks that P&S would undertake: (1) Prepare durable powers of attorney; (2) Prepare CLTs; (3) Establish the Foundation and obtain appropriate tax determinations of exempt status; and (4) Establish PIPM and obtain appropriate tax determinations of exempt status. P&S noted in the letter that it had not represented any of the parties in negotiating the terms and conditions of the transactions in question, but rather that the parties had negotiated those things themselves.  Tom signed the conflicts waiver letter on Philip's behalf.

{38}    On December 6, 1993, Tom executed the charitable trust indenture creating the Foundation. The indenture named the trustees as Tom, Jerri and Philip. The Foundation  was initially funded with a corpus of $2 million, all of which had been earlier transferred directly from the PIM Account.  The original indenture itself names Philip alone the "Donor."

{39}    On December 8, 1993, two CLTs were executed by Tom as attorney-in-fact for Inge and Philip.

Neither Philip nor Inge had any donative intent at the time their CLTs were created. Each was funded with $5 million that was transferred directly from the PIM Account. The income generated from each CLT would be transferred quarterly to the Foundation. Tom directed that neither Centura nor P&S contact the Statons about the CLTs and neither did so.

{40} In December 1993, Tom informed Philip that he had created a CLT in Philip's name and funded it with $10 million. Philip assumed at the time that his (Philip's) own money had been used to fund the CLT and that the money had come out of the $119 million in Panamco sale proceeds which had been deposited into the PIM Account. Tom did not tell Philip that an identical CLT was created in Inge's name. Tom also told Philip that the income from the CLT would be used to fund the pain clinic. Philip neither objected to the transaction nor did he attempt to retrieve his money from the CLT. Tom told Philip that the creation of the CLT and Foundation would not cost him any money. That was incorrect; the way the CLTs were established was not in the best interests of Philip or Inge.

{41} Tom did not consult with the Staton's tax advisor, Charles Hirsh, before establishing the CLTs. Nor did he ask for or receive tax advice from P&S. P&S did not have the necessary information about the Staton's financial condition to provide such advice.

{42} Tom did not advise Inge of the existence of the CLTs or the Foundation, nor did he tell Philip about the charitable gift made for Inge.

{43} After establishing the CLTs and the Foundation in December 1993, P&S continued to perform legal work for PIPM. The firm drafted documents establishing PIPM as an entity and worked with the Doctors on attaining tax-exempt status from the IRS for PIPM. In September 1994 PIPM received notification that the IRS awarded it a 501(c)(3) tax-exempt designation. Upon its notification of tax-exempt status, PIPM requested funding from the Foundation. A draft letter called Grant and Expenditure Responsibility Requirements ("Grant Letter") provided for an initial grant of $2 million and outlined the circumstances under which future funding would continue. The Grant Letter makes funding expressly conditional upon the Foundation's having funds available and PIPM's retention of its tax-exempt status and requires that PIPM renew its grant request in writing each year. The Grant Letter also contained the following language: "It is also understood and agreed that the Foundation's undertaking to provide long-term funding for the Institute shall in no way result in any personal liability on the part of the Foundation's trustees . . . ."

{44} On September 23 or 24, 1994, Inge sent a fax to Tom requesting financial information and documentation. Inge acknowledges that this fax is the only written request she ever made of Tom about her finances in the United States. She did not receive the requested documentation.

{45} In the September fax from Inge, she reported the favorable results she had achieved in handling Colombian investments for herself and Philip. She said that she had "complete control over everything done" in Colombia, and wanted to become more involved in decision-making in the United States financial matters. Philip instructed her to clear all Colombian investments through Tom before committing to them, and she did as Philip asked. However, she said that it became clear to her during the course of her frequent communications with Tom in 1993 and 1994 that he did not have sufficient "financial expertise" to give her financial advice.

{46} When asked why she entrusted her financial matters entirely to Philip despite her misgivings about Tom, Inge stated, "Philip had already been named as my trustee, and I trusted Philip. And Philip, in turn, trusted Tom."

{47} On October 24, 1994, the Doctors signed employment agreements with PIPM. All three contracts called for an initial employment term expiring on January 17, 2000, with automatic one-year renewals thereafter. All three contracts also provided that employment could be terminated without cause at any time after the first year of employment upon ninety days' notice.

{48}    On October 24, 1994, P&S drafted two new CLT instruments at the request of Centura and Tom. One was in the name of Inge and one was in the name of Philip, and each was to be funded with $4 million. These two CLTs contained terms that were essentially identical to the 1993 CLTs. Neither Inge nor Philip were advised of the creation of these CLTs.

{49}    On February 1, 1995, and again on February 28, 1995, Inge executed several General Powers of Attorney ("1995 Powers") appointing Tom, Jerri and Philip as her attorneys-in-fact. These powers provided: "My agent [Tom] shall have full power and authority to act on my behalf. This power and authority shall authorize my Agent [Tom] to manage and conduct all of my affairs and to exercise all of my legal rights and powers, including all rights and powers that I may acquire in the future."

{50}    On February 1, 1995, Mercedes also executed General Powers of Attorney appointing Jerri, Inge and Philip as her attorneys-in-fact. These powers contain identical terms to the powers signed by Inge on that date.

{51}    In February 1995, PIPM opened and began seeing patients. It had received distribution of the original $2 million transferred from the PIM account to the Foundation.

{52}    In early October 1995, Charles Hirsh, accountant for the Statons, called Centura and P&S. This is the first contact that anyone at P&S had with Hirsh. Hirsh indicated that the Foundation's trust indenture should have reflected a $1 million contribution from Inge and a $1 million contribution from Philip, rather than a $2 million contribution solely from Philip. The trust documents were amended by P&S to reflect both Inge and Philip as donors.

{53}    In October 1995, Inge and Jerri met in Miami. At the meeting, Jerri told Inge that Tom had caused the Statons numerous financial problems, "that [Tom] had created a lot of things," and that she [Jerri] was trying to fix them. Inge and Jerri arranged to meet again in December 1995 to discuss the matter further.

{54}    In November 1995 Tom's authority to act on behalf of the Statons was revoked. Tom and Jerri became estranged.

{55}    On February 29, 1996, Inge executed another Durable Power of Attorney appointing Jerri as her attorney-in-fact with plenary power to "do and perform for me anything of any character which I might do or perform if I were personally present and acting."

{56}    On March 13, 1996, Mercedes executed another Durable Power of Attorney appointing Jerri as her attorney-in-fact. This power is virtually identical to the power signed by Inge on February 29, 1996.

{57}    On March 13, 1996, Inge and Mercedes hired attorney William West ("West") to represent them in attempting, among other things, to terminate funding of the CLTs and Foundation. On March 27, 1996, Centura officials Everett Wells ("Wells") and Jarvis both resigned from the Board of Directors of PIPM. On the same date, Centura resigned as a trustee of the Foundation.

{58}    On or about March 26 or 27, 1996, West called Meloy, told him he represented Inge, and requested an immediate meeting to discuss PIPM and its operation. At the time, PIPM was represented by P&S. Meloy and Martin met West at his office, and West told them that Inge had not authorized the funding framework for PIPM and that she hired him to get her money out of the CLTs at Centura. West told the Doctors that he, in an effort to resolve this matter, had scheduled a meeting with Centura officials on March 29, 1996, and stated that the Doctors should attend this meeting. There are factual disputes concerning exactly what was said about the powers of attorney.

{59}    On March 29, 1996, a meeting was held at Centura. Attorneys Mary Beth Johnston and Curtis Twiddy from P&S attended. Wells, Jarvis, and John Fleming, as in-house counsel for Centura, attended. In addition, attorney Winburne King was present as Centura's legal representative. Philip's attorney, Mr. Rupert, was present, as was Inge's attorney, West. The Doctors also attended. West

informed everyone present of Inge's position that there was no authority for the creation of the funding framework and that she had never authorized anyone to commit any of her money to fund PIPM. Mr. Rupert stated that Philip would no longer fund the Foundation or PIPM.

{60} Immediately following the meeting, Johnston told the Doctors that P&S would not be able to represent PIPM unless the firm could get conflict waivers from the other parties.

{61} On March 30, 1996, West contacted Martin and Meloy and requested another meeting. During this meeting, he again conveyed his position that the funding framework was invalid and that there were no powers of attorney from his client which authorized the establishment of the CLTs in her name; he reiterated his intent to file on the following Monday a temporary restraining order to freeze the funding framework, including PIPM's operation, and advised them that their only course was to abandon their claims to funding and resolve all issues with the Statons. West recommended an attorney to the Doctors to represent them in discussions with Philip and Inge. On that same date, PIPM agreed to be represented by and were represented by Edward Powell, the local attorney contacted by West. Mr. Powell was an experienced attorney. He continued to represent PIPM through and after execution of their settlement agreement with the Statons.

{62} On April 1, 1996, Johnston orally notified Meloy that Centura would not waive their conflict and that P&S would not be able to represent PIPM. That notice was reduced to writing on April 3, 1996. On April 4, 1996, Johnston sent a fax memo to Powell, along with all the other parties, offering to provide copies of documents from P&S's file, conditional upon the agreement of all the parties.

{63} On April 8, 1996, Inge terminated her relationship with West and hired Fred Harwell.

{64} On April 11, 1996, a proposed settlement agreement, signed by PIPM, was faxed to the office of Fred Harwell. He informed the other parties that Inge would not be a party to the settlement agreement.

{65} On April 16, 1996, the settlement agreement ("Settlement") was completed. In the Settlement, the Doctors and PIPM agreed to "release, acquit and forever discharge" the Foundation and Inge and Philip individually in exchange for the Foundation's payment of $365,000 to PIPM. Meloy does not recall reviewing any documents prior to reaching this settlement agreement. Specifically, he did not review a copy of Philip's 1993 Durable Power of Attorney. He did not have a copy himself, and he did not ask anybody for one. PIPM released the Foundation. At that time PIPM still retained approximately $425,000 of the initial $2 million distribution. Execution of the settlement agreement destroyed the purpose for which the Foundation and the CLTs were created.

{66} On March 1, 1997, the Doctors entered an agreement with Winston-Salem Anesthesia Associates, P.A. ("WSAA"). Under the agreement, WSAA purchased substantially all of PIPM's equipment and employed the Doctors. With the addition of a third group of anesthesiologists, the new group became known as Piedmont Anesthesia & Pain Consultants ("PAPC"). All of the PAPC physicians are currently paid the same amount, just as all of the WSAA physicians were when Meloy worked with them prior to joining PIPM.

{67} After March 1, 1997, PIPM had no obligations, leases or debt other than a lease for office space.

{68} The Complaints and Amended Complaints implicating statutes of limitations and repose were filed as follows:

| Date | Complaint | Plaintiffs | Assert Claims Against |
|------|-----------|-----------|----------------------|
| March 11, 1996 | 96CVS1409 | Philip | Tom & Jerri |
| June 10, 1996 | 96CVS1409 | Inge & Mercedes | Jerri, Tom, Philip, Gayle |
| November 20, 1996 | 96CVS7140 | PIPM | Poyner & Spruill |

| Date | Case No. | Plaintiff | Defendant |
|---|---|---|---|
| November 25, 1996 | 96CVS7224 96CVS7140 | Philip Staton | Centura Bank |
| July 31, 1997 | 96CVS1409 96CVS7224 | Philip | Poyner & Spruill |
| February 24, 1997 | 96CVS7224 96CVS7140 | Centura Bank | Statons |
| March 3, 1998 | 96CVS1409 96CVS7140 96CVS7224 | Inge & Mercedes | Centura Bank & Poyner & Spruill |
| March 25, 1999 | 99CVS2628 | Inge & Mercedes | PIPM |
| April 14, 1999 | 99CVS2628 | PIPM Counterclaim | Inge & Mercedes, & West |
| July 14, 1999 | 99CVS5156 | Inge & Mercedes | Centura Bank |
| February 25, 2000 | 00CVS2178 | PIPM | Philip, Inge & Mercedes |

## II.
## Standard of Review

{69}  Pursuant to Rule 56(c) of the North Carolina Rules of Civil Procedure, summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law.  *See* N.C. R. Civ. P. 56(c); *see also Beam v. Kerlee*, 120 N.C. App. 203, 209, 461 S.E.2d 911, 916 (1995)  (recognizing that summary judgment is appropriate only when "there is no dispute as to any material fact").  As moving parties, defendants have "the burden of showing there is no triable issue of material fact."  *Farrelly v. Hamilton Square*, 119 N.C. App. 541, 543, 459 S.E.2d 23, 25-26; *see also Taylor v. Ashburn*, 112 N.C. App. 604, 606, 436 S.E.2d 276, 278 (1993).  In determining whether that burden has been met, the court "must view all the evidence in the light most favorable to the non-moving party, accepting all its asserted facts as true, and drawing all reasonable inferences in its favor."  *Lilley v. Blue Ridge Elec. Membership Corp.*, 133 N.C. App. 256, 258, 515 S.E.2d 483, 485 (1999); *see also Murray v. Nationwide Mut. Ins. Co.,* 123 N.C. App. 1, 472 S.E.2d 358, 362 (1996).

{70}  To grant summary judgment, the court must conclude that no reasonable jury could find in favor of the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  When considering a motion for summary judgment, the judge must determine whether a fair-minded jury could return a verdict for the non-movant on the evidence presented.  *See Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, No. 98-2847, 1999 U.S. App. LEXIS 21487, at *10 (4th Cir. Sept. 7, 1999) (quoting *Anderson*, 477 U.S. at 252).

## III.
## Pending Claims

{71}  Set forth below are the remaining claims in this litigation.  In each instance, the party against whom a claim is asserted has moved for summary judgment.

{72}  PIPM asserts claims for fraud, negligent misrepresentation and interference with contract against Inge and Mercedes.

{73}  PIPM asserts claims for breach of contract, breach of fiduciary duty, negligent misrepresentation, undue influence and fraud against Philip and the Foundation.

{74}  PIPM asserts claims for breach of contract, breach of third-party beneficiary contract, professional negligence, negligent misrepresentation, constructive fraud, breach of fiduciary duty, breach of the rules of professional conduct, and claims for damages pursuant to N.C.G.S. § 84-13 against P&S.

{75}  PIPM asserts claims for constructive fraud, fraud, breach of fiduciary duty, fraudulent

misrepresentation, negligent misrepresentation, unfair trade practices and special damages against Centura Bank.

{76}    PIPM also requests that the Court grant a declaratory judgment stating that the Foundation and CLTs are valid.

{77}    PIPM asserts claims for fraud, negligent misrepresentation, breach of the duty of good faith and interference with contract against Inge and Mercedes.

{78}    Inge and Mercedes assert claims for conversion against PIPM.

{79}    For the reasons stated below, the Court: 1) grants summary judgment for Philip, Inge and Mercedes for all PIPM's and the Doctors' claims; 2) grants summary judgment for P&S for breach of contract, breach of third-party contract, breach of fiduciary duty, constructive fraud, breach of the rules of professional conduct, and damages pursuant to N.C.G.S. § 84-13; 3) denies summary judgment for P&S for professional negligence and negligent misrepresentation; 4) grants summary judgment for Centura on claims for breach of fiduciary duty, constructive fraud, fraud, fraudulent misrepresentation, unfair trade practices and special damages; 5) denies summary judgment for Centura for negligent misrepresentation; 6) denies PIPM's request for declaratory judgment; and 7) grants summary judgment to PIPM for claims asserted by Inge and Mercedes.

## IV.
## The PIPM Settlement Agreement

{80}    As a threshold matter the Court first addresses the validity and effect of the Settlement agreement between PIPM and Philip, Inge and the Foundation.  As noted above, by written agreement dated April 16, 1996, PIPM and the Doctors released the Foundation and the Statons from any past or future claims arising out of funding for PIPM by the Staton Foundation.  The validity of the Settlement determines the claims that PIPM may now pursue.

{81}    For the reasons set forth below the Court concludes as a matter of law that the Settlement deprives PIPM and its principals of standing to pursue any claim to enforce the funding of PIPM by the Foundation or to pursue a declaratory judgment action.  It further deprives PIPM of any claim for damages it would have recovered from any party under its contract, including Centura and P&S, because PIPM released its contractual rights in return for a cash payment.  The Settlement is also a bar to any claims against Philip and Inge Staton since it specifically and directly released any claims against them arising from events up to the date of the execution of the Settlement.

## A.
## PIPM Lacks Standing To Enforce Trusts

{82}    As a general rule, only the Attorney General may sue to enforce a private trust. *Kania v. Chatham*, 297 N.C. 290, 291-92, 254 S.E.2d 528, 530 (1979).  This rule is especially true when the trustees are vested with the discretion to select the beneficiaries. *Id.* at 292, S.E.2d 530.  The trust indenture to the Foundation contains the following language:

> THIRD:  A. The principal and income of all property received and accepted by the trustees to be administered under this Declaration of Trust shall be held in trust by them, and the trustees may make payments or distributions from income or principal, or both, to or for the use of such charitable organizations, within the meaning of that term as defined in paragraph C, in such amounts and for such charitable purposes of the trust as the trustees shall from time to time select and determine. . . .

> B.  The trust shall continue forever unless the trustees terminate it and distribute all of the principal and income, which action may be taken by the trustees in their discretion at any

time. . . .

By the above language in the trust indenture, the trustees had complete discretionary power to select the beneficiaries. Thus, by this indenture alone, PIPM would not have had standing to enforce the charitable purpose of the Foundation.

{83}     The Foundation created an additional relationship with PIPM: the Grant Letter promised PIPM at least $1 million per year in funding for twenty years. "A person who has a 'special interest' in the performance of a charitable trust can maintain a suit for its enforcement." *Id.* at 292, S.E.2d 530. Therefore, by virtue of the Grant Letter, PIPM has a special interest in the Foundation and standing to sue the Foundation. The settlement agreement, however, released the Statons and the Foundation from its contractual relationship with PIPM, thus removing any standing PIPM may have had to sue and rendering a declaratory action moot. A declaratory judgment action is inappropriate when the question presented has been rendered moot. *Hicks v. Hicks*, 60 N.C. App. 517, 523, 299 S.E.2d 275, 279 (1983); *see also Morris v. Morris*, 245 N.C. 30, 36, 95 S.E.2d 110, 114 (1956). A dispute that has already been resolved is considered moot. *Black's Law Dictionary* 697 (6th ed.1990).

## B.
### The PIPM Settlement Is Binding And Enforceable

{84}     PIPM seeks to avoid the impact of the Settlement by attacking the circumstances under which it was signed. At the heart of each cause of action is the premise that the Doctors did not know that Philip had signed the 1993 Durable Power in his own name and the knowledge of that fact might have kept them from signing the Settlement, thereby releasing their contract claims against the Foundation. For the reasons set forth below, the Court concludes as a matter of law that the PIPM Settlement is binding and enforceable.

## 1.
### Philip Did Not Owe A Fiduciary Duty To PIPM

{85}     PIPM claims that Philip as trustee to the Foundation owed a fiduciary duty to PIPM to affirmatively disclose the existence of the powers of attorney signed by Philip that were used to establish the Foundation and the CLTs. The Court rules that a fiduciary relationship did not exist between Philip Staton and PIPM and that even if a fiduciary relationship existed, that relationship ceased before the negotiations of the settlement agreement ensued. It is undisputed that the Grant Letter did create a contractual relationship between the Foundation and PIPM. This contract was breached when the Foundation failed to fund PIPM in 1995 and was renunciated by Philip and Inge in March 1996.

{86}     A fiduciary relationship is defined as follows:

> The [fiduciary] relation may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of one reposing confidence. . . . [I]t extends to any possible case in which a fiduciary relation exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other.

*Abbitt v. Gregory,* 201 N.C. 577, 598, 160 S.E. 896, 906 (1931). Generally a trustee owes a fiduciary duty to a beneficiary. *Id.* However, under the facts in this case, the Court has difficulty charging a fiduciary duty to a trustee who is challenging the validity of the trust and his position as trustee. Research reveals no case not wholly distinguishable from the facts in the case at bar in which breach of fiduciary duty was brought against a trustee. It should also be noted that PIPM has sued neither Tom nor Jerri, the other two trustees of the Foundation.

## 2.
### Any Fiduciary Duty Was Terminated Prior To The Settlement

{87}   Even if Philip did owe a fiduciary duty to PIPM, this duty ended when Philip, through his lawyer, told the parties that he would no longer fund the Foundation or PIPM. *See Small v. Dorset,* 223 N.C. 754, 761, 28 S.E.2d 514, 518 (1944) (a trust relationship continues until one of the parties repudiates that relationship). Hence, Philip repudiated the fiduciary relationship, and his duty to disclose the existence of any powers of attorney ended at that time. Moreover, fiduciary relationships end when parties become adversaries. *See Lancaster v. Lancaster,* 138 N.C. App. 459, 530 S.E.2d 82 (2000). After failing to receive the promised funding in 1995, the PIPM Parties were told in March 1996 that neither Philip nor Inge would fund PIPM. At this time PIPM's interests were directly adverse to those of the Statons and, in fact, Philip had both breached his contract with PIPM in 1995 and repudiated any continuing obligations in March 1996. Additionally, PIPM was advised by West to retain counsel, advice PIPM followed when it hired Powell. The adversarial relationship was further evidenced by the need for a settlement agreement, which PIPM signed after retaining its own counsel. On these facts the Court can find no fiduciary duty between Philip individually or as trustee of the Foundation. The lack of fiduciary duty between Philip and PIPM puts the burden on PIPM to ascertain the facts surrounding the establishment of the Foundation. *See Dorset,* 223 N.C. at 761-62, 28 S.E.2d at 518-19   Philip did not have a duty to disclose such facts.

### 3.
### PIPM Cannot Maintain A Fraud Claim Against Philip

{88}   PIPM also claims fraud against Philip in connection with the execution of the Settlement. To recover for fraud, PIPM must "present evidence tending to show (1) a false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) which was relied upon and resulted in damages to the injured party." *Pleasant Valley Promenade v. Lechmere, Inc.,* 120 N.C. App. 650, 663, 464, S.E.2d 47, 57 (1995).

### a.
### The Fraud Claim Is Barred By The Statute of Limitations

{89}   The fraud claim asserted against Philip in 00-CvS-2178 is dismissed because it is barred by the statute of limitations and because PIPM cannot prove the essential elements of a fraud claim.

{90}   The statute of limitations for fraud begins to run three years after the fraud is discovered or should have been discovered.   N.C.G.S. § 1-52 (1); *Bennett v. Anson Bank & Trust Co.,* 265 N.C. 148, 155, 143 S.E.2d 312, 217 (1965).   The North Carolina Supreme Court states that:

> It is generally held that where there is concealment of fraud or continuing fraud, the statute of limitations does not bar a suit for relief on account of it, and thereby permits the statute which was designed to prevent fraud to become an instrument to perpetrate and perpetuate it. . . . Where a confidential relationship exists between the parties, failure to discover the facts constituting fraud may be excused. In such a case, so long as the relationship continues unrepudiated, there is nothing to put the injured party on inquiry, and he cannot be said to have failed to use due diligence in detecting the fraud. . . .

*Bennett v. Anson Bank & Trust Co.,* 265 N.C. 148, 155, 143 S.E.2d 312, 318 (1965) (quoting *Small v. Dorsett,* 223 N.C. 754, 761, 28 S.E.2d 514, 518). PIPM admits in its brief that Philip, "in March, 1996 . . .refused to pay the grant monies due and repudiated his fiduciary duties. . . ." (PIPM Response Opp. SJ at 7). This was a clear indication by Philip that he repudiated any fiduciary relationship he might have had with PIPM or the Doctors. In light of this repudiation, PIPM was put on notice in March 1996 to use due diligence to investigate and discover whether fraud existed before signing the settlement agreement; the statute of limitations began to accrue in March 1996 and ran out in March 1999. If PIPM had requested at that time a copy of the very documents at issue, it could have discovered any allegedly fraudulent behavior by defendants. PIPM did not ask for any documents as it entered into settlement negotiations. Nor did PIPM consult with the Brames or request any information from the Brames before signing the settlement agreement. This action was not filed until February 2000. Although the parties signed a tolling agreement

it too was signed outside the statute of limitations period on April 14, 1999.  The statute of limitations bars PIPM's fraud claims against Philip.

**b.**
**PIPM Could Not Have Reasonably Relied On Philip**

{91}    Even in the absence of the statute of limitations bar to the fraud claim, the fact that PIPM was represented during the settlement negotiations indicates that PIPM did not rely on Philip or on Philip's counsel.  If there was any reliance it could not be reasonable given the adversarial position of the parties. PIPM retained counsel on March 30, 1996, and the Settlement was finalized on April 16, 1996.  In his deposition testimony Meloy denies ever discussing the settlement agreement with either Philip or his attorneys.   While there may be a dispute as to what was said at the March 1996 meeting at Centura, there is no dispute that the 1993 Durable Powers existed and PIPM made no effort to obtain or review the powers prior to settlement but instead relied solely upon the representations and guidance of its attorney Mr. Powell.

**c.**
**There Was No Misrepresentation Or Undue Influence**

{92}    PIPM's claim for undue influence in connection with the Settlement also fails for lack of any evidence supporting such claim.   There is no evidence on the record of any undue influence.  PIPM retained its own experienced counsel, Ed Powell, in connection with negotiations of the Settlement.  PIPM subsequently sued Powell for malpractice in connection with those negotiations.  (Compl. 99-CvS-3178). Neither PIPM nor the Doctors were in any immediate physical or financial danger, and PIPM had in its bank account over $400,000 left from the original $2 million funding.  The Doctors never talked to Philip Staton or his attorneys after the March 30, 1996 meeting.  The only thing Philip and his counsel did in the meetings prior to the settlement negotiations was to state their legal position.  The fact that their legal position was correct -- PIPM would cease to be funded -- cannot, in and of itself, constitute undue influence.  PIPM exercised its own free will in settling with Philip and the Foundation.[FN1]

{93}    Philip's counsel clearly put PIPM on notice that Philip was contesting the creation of the CLTs and the Foundation.  That fact was true.  Legal grounds for Philip's challenge existed.  Whether or not he would have prevailed on his claims at trial was the risk he and PIPM faced in April 1996 and on which they negotiated and compromised.  The legal grounds for Inge's challenge were even clearer.  There was no misrepresentation.

{94}    For the foregoing reasons the Court finds that the settlement agreement between Philip, the Foundation and PIPM is valid and enforceable.

**C.**
**PIPM's Breach Of Contract Claim Fails**

{95}    The statute of limitations on PIPM's breach of contract claim filed in 00-CvS-2178 has also run. As indicated above, Philip had both breached his contract with PIPM in 1995 and repudiated any continuing obligations in March 1996.  The statute of limitations for breach of contract is three years. N.C.G.S. § 1-52(1).  This action was not filed until February 2000, and the tolling agreement was not signed until April 14, 1999.  Thus, the claim for breach was filed outside of the limitations period.

{96}    Finally, the Grant Letter specifically states that the parties agreed that "the Foundation's undertaking to provide long-term funding to [PIPM] shall in no way result in any personal liability on the part of the Foundation's trustees . . . ."  On this basis alone, Philip cannot be held personally liable for damages PIPM may have suffered.

**V.**
**PIPM's Claims Against Ingeborg Staton Fail**

{97}     In 99-CvS-2628 and 00-CvS-2178, PIPM asserts against Inge claims for fraud, negligent misrepresentation and interference with contract.  The Court grants summary judgment for Inge for all claims asserted therein.  PIPM's claims against Inge should be considered in light of circumstances surrounding the creation of her CLTs.

{98}     Tom never discussed the creation of the CLTs or the Foundation with Inge.  He never discussed charitable gifts with her at all.  Nor did Tom have authority to make charitable gifts on her behalf; he did not have any direct authority from her, and he did not have indirect authority from Philip to make charitable gifts for her.  *Vaughn v. Batchelder,* 633 So.2d 526, 528 (1994) (Powers of attorney are strictly construed and will only grant those powers that are specified.); Fla. Stat. ch. 709.08 (1992).  Philip did not have authority to make charitable gifts for Inge and thus could not have transferred that authority to Tom.  *See id.*  Nor did Philip have authority under the 1992 Florida powers to sign a power of attorney for Inge.  *See id.*  Not only was Tom Brame acting outside the scope of any of the written powers of attorney, he was not acting in the best interests of his principal, even if he was her agent.  *See Hutchins v. Dowell*, 138 N.C. App. 673, 676 531 S.E.2d 900, 902 (2000) ("An attorney-in-fact is presumed to act in the best interests of the principal, and a gift of the principal's property is potentially adverse to the principal's interests.  Such power will not be lightly inferred from broad grants of power contained in a general power of attorney.")  The failure to make any inquiry into the benefits of the CLTs, alternatives for tax planning, or Inge's desires with respect to charitable giving constituted a breach of his fiduciary duty to Inge.  *See id.*  The magnitude of the transactions involved required the exercise of skill, caution and consideration of the principal's best interest.  All were lacking in this situation.  It is clear that the CLTs set up in Inge Staton's name were unauthorized and in breach of her agents' fiduciary duty.  Inge Staton had no donative intent, and no other person was authorized to make charitable gifts on her behalf.  Nor were there sufficient funds in the PIM account in her individual name to fund the irrevocable CLTs.  It would have required invasion of her revocable trust to fully fund the new CLTs.

## A.
## PIPM's Fraud Claim Is Barred by the Statute Of Limitations

{99}     First the Court observes that as noted above the statute of limitations for fraud against Inge began to toll when PIPM was obligated to use due diligence to discover any fraud.  Notice was given in March 1996 that Inge would take steps to dismantle the funding of the Foundation.   At that time PIPM had a duty to use due diligence.  Again, as noted above, if PIPM had requested at that time a copy of the very documents at issue it could have discovered any allegedly fraudulent behavior by defendants.  PIPM did not ask for any documents as it entered into settlement negotiations.   PIPM did not assert claims against Inge until April 1999, over three years later.  Thus, the statute of limitations bars PIPM's claim for fraud against Inge.

## B.
## There Was No Misrepresentation Made By Inge Staton

{100}   Even if the statute of limitations did not bar PIPM's fraud claim, PIPM cannot successfully prove that it reasonably relied on any alleged assertions made on behalf of Inge.  From the very first meeting with West, Inge's attorney, PIPM was placed on notice that it was in an adversarial relationship with Inge with respect to the validity of the Foundation.  Further, Inge was not a trustee of the Foundation and owed no fiduciary duties to PIPM.  Thus, it cannot be said that PIPM reasonably relied on any assertions made by West with respect to the validity of the Foundation and the CLTS.

{101}   Moreover, the representations allegedly made by West were true.  This Court has determined that neither Philip, Tom nor Jerri had express authority to create the CLTs or the Foundation on behalf of Inge, and any apparent authority given otherwise was a hotly contested factual dispute.  West's position and that of his client was that the CLTs in Inge's name were invalid and that sufficient evidence existed to support that assertion if made.  Therefore, any statements made by West as to the validity of the Foundation were not known to be false and, this Court believes, were mere expressions of a legal opinion.  Additionally,

absent a fiduciary duty, Inge did not have a duty to disclose the existence of powers of attorney that might or might not have authorized funding of the Foundation.

{102} PIPM's claim for negligent misrepresentation fails on much the same grounds as the fraud claim. First, West's duty was to his client Inge, not to PIPM. "Justifiable reliance is an element of negligent misrepresentation in North Carolina." *APAC-Carolina v. Greensboro-High Point Airport Auth.,* 110 N.C. App. 664, 680, 431 S.E.2d 508 (1993) (citing *Forbes v. Par Ten Group, Inc.*, 99 N.C. App. 587, 597, 394 S.E.2d 643, 648 (1990)), *disc. rev. denied*, 328 N.C. 89, 402 S.E.2d 824 (1991). As indicated above, any reliance by PIPM was not justifiable and PIPM fails to state a claim for negligent misrepresentation.

## C.
## The Interference With Contract Claim Fails

{103} The elements for interference with contract are:

> 1) that a valid contract existed between the plaintiff and a third person, conferring upon the plaintiff some contractual right against the third person;
>
> 2) that the outsider had knowledge of the plaintiff's contract with the third person;
>
> 3) that the outsider intentionally induced the third person not to perform his contract with the plaintiff; and
>
> 4) that in so doing the outsider acted without justification; and
>
> 5) that the outsider's act caused the plaintiff actual damages.

*Smith v. Ford Motor Co.,* 289 N.C. 71, 85, 221 S.E.2d 282, 290 (1976) (quoting *Childress v. Abeles*, 240 N.C. 667, 84 S.E. 2d 176 (1954). PIPM cannot carry its burden with respect to this claim for several reasons. First, Inge reasonably and with legal justification asserted what she believed was her right to terminate funding of the Foundation. Second, with the settlement agreement PIPM voluntarily relinquished its contract with the Foundation. Third, as indicated below, Inge had a qualified right to interfere with PIPM's contract with the Foundation even if the settlement agreement were invalid.

{104} In North Carolina a distinction is made between an outsider and a non-outsider who is not a party to the contract. The Supreme Court describes it thusly:

> [An outsider] appears to connote one who was not a party to the terminated contract and who had no legitimate business interest of his own in the subject matter thereof. Conversely, one who is a non-outsider is one who, though not a party to the terminated contract, had a legitimate business interest of his own in the subject matter. A non-outsider has a *qualified* right to bring about the termination of another's . . . contract . . . when, in good faith, he believes this to be necessary to protect his own legitimate . . . interest.

*Id* at 87, 84 S.E.2d at 293 (citing *Wilson v. McClenny,* 262 N.C. 121, 136 S.E.2d 569 (1964)). One million dollars of Inge's funds was used for the initial contribution to the Foundation, and her CLT was to continue funding the Foundation. In this Court's view, these circumstances gave Inge non-outsider status. Inge's CLT and the Foundation were established without written authority from her, and the entire transaction is clouded in factual disputes. In order to protect her legitimate interests in voiding the CLTs and the Foundation as well as preserve her trust income, Inge had a right to take actions to halt the funding of PIPM.

## VI.
## PIPM's Damage Claims

{105} The Court next addresses PIPM's liability claims against P&S and Centura. In doing so, the Court

addresses the damages issues first because the measure of damages permeates the liability issues. At the heart of the dispute between PIPM and P&S and Centura is the measure of damages under any cause of action asserted by PIPM against those two parties.

{106} PIPM seeks damages from Centura and P&S that would compensate it for the loss of the benefit of the funding from the Foundation. The Doctors are not content with a measure of damages that compensates them for any damages incurred from changes in their situation resulting from the creation and subsequent termination of the Foundation.[FN2] The various causes of action PIPM has asserted are all directed in some way toward recouping what was in the beginning an unexpected and unearned windfall -- the funding from the Foundation.

### A.

{107} It is important to focus on what caused the collapse of the CLTs and the Foundation. The fault is directly attributable to the actions of Tom Brame. He encouraged Dr. Meloy to develop a proposal for a pain clinic without even discussing the matter with the Statons. He directed Centura to fund the Foundation before it was even created. He directed P&S and Centura not to contact the Statons. He procured the signature of Philip Staton on the 1993 Durable Powers by misrepresenting the purpose of the power. He failed to follow P&S's instructions regarding the powers created for Inge's and Mercedes' signatures, and he committed funds to Inge's CLTs in her name from assets belonging to Inge's Revocable Trust without ever telling her or Philip what he had done. He had the CLTs created without tax advice and without due consideration of the wishes or best interests of his principals. In sum, he breached his fiduciary duty and was negligent. But for his negligence and breach of fiduciary duty, the CLTs and Foundation would never have been created, and PIPM would not have received the $2 million initial funding.

{108} Centura and P&S may possibly be held responsible to PIPM for two actions on their part. Both failed to contact the Statons in connection with the establishment of the CLTs and Foundation and both failed to see that Inge properly executed the 1993 Durable Power. The record is undisputed that had Inge been contacted and, had she known the purpose of the 1993 Durable Power, she would not have agreed to use $10 million of her funds to establish an irrevocable trust to fund the Foundation or PIPM.

{109} The record is also undisputed that had Philip Staton been fully and accurately informed of the nature and consequences of his CLTs he would not have consented to the CLTs' creation.

{110} In short, the alleged acts of negligence in 1993 upon which PIPM relies for its claims against Centura and P&S could not have been the proximate cause of the collapse of the funding for the Foundation. Those alleged acts of negligence could have been the proximate cause of losses, if any, arising out of the Doctors' changes in positions by starting PIPM in the mistaken belief that it would be funded for twenty years.

{111} Likewise the alleged acts of negligence or negligent misrepresentation alleged to have occurred in 1996 are not the proximate cause of any loss of funding. PIPM's claims with regard to the 1996 claims are premised upon the failure of either Centura or P&S to disclose that Philip's 1993 Durable Power was properly signed and in existence. That failure could not be said to be the cause of the termination of Inge's CLTs. It could only support a claim that, had the Doctors known that a properly executed 1993 Durable Power existed for Philip, they would have litigated with Philip over the validity of his CLTs rather than settling. Putting aside for the moment the liability issues on those claims, it is clear from the record that termination of the CLTs had to be based upon the acts of Tom Brame, not the question of whether Philip had properly executed the 1993 Durable Power.

{112} Philip and Inge were contesting the validity of the CLTs on a number of grounds. The existence of Philip's signed 1993 Durable Power could not affect Inge's claims in any way and was only a component in the whole question of the validity of Philip's CLTs. Even if a jury were to determine that Centura or P&S had a duty to disclose the existence of Philip's 1993 Durable Power and failed to do so, the failure to

do so was not the proximate cause of loss of funding from Philip's CLTs and the Foundation, nor was it the proximate cause of loss of funding from Inge's CLTs.

{113}  Put another way, PIPM's claims appear to be based on a theory that if P&S and/or Centura had obtained Inge's signature on the 1993 Durable Power prepared for her and had told PIPM that Philip had signed his 1993 Durable Power, then the Statons would have been stuck with the actions of Tom Brame, PIPM would have remained fully funded for twenty years, and the Doctors would have continued to receive their improved individual compensation.  The 1993 Durable Powers are not the key determinant of the validity and termination of the CLTs.  The absence of authority for Tom to act on Inge's behalf was not based upon improper execution for the powers of attorney but upon her unwillingness to fund the CLTs and lack of knowledge that it had been done.  The existence of authority to act on Philip's behalf could not prevent termination of Philip's CLTs, where Tom's actions were taken in breach of fiduciary duty and were negligent.  Knowledge of the existence of the 1993 Durable Power signed by Philip would not have affected the outcome of the termination of the CLTs, and thus any alleged failure to the disclose the existence of the 1993 Durable Powers was not a proximate cause of cessation of funding to PIPM.  It was not any act of P&S or Centura that cause the CLTs and Foundation to be terminable.  The actions of Tom Brame were the proximate cause of the termination of the CLTs.

{114}  The Settlement itself acts as a bar to any claim for loss of funding.  PIPM and the Doctors had a contract with the Foundation.  The Settlement released the Foundation from that contract, thus terminating it in exchange for cash.  Having terminated the contract, the PIPM Parties may not now sue P&S and Centura for the loss of funding the contract provided.  This outcome, the loss of the contract claim, was one of the grounds asserted in PIPM and the Doctors' malpractice action against Powell.

## VII.
## The Settlement Agreement Further Limits Damages

{115}  The Court's finding that the Settlement agreement between the Foundation, Philip, PIPM and the Doctors is valid and binding and that damages do not encompass the continuation of funding for PIPM impacts the remaining claims filed by PIPM against P&S and Centura.  The damages recoverable by PIPM and the Doctors arising out of the transactions involved in this case, i.e., the establishment of the CLTs and Foundation, are limited to damages in excess of the damages already recovered by PIPM in the Settlement agreement.  *See Chemimetals Processing, Inc. v. Schrimsher,* 140 N.C. App. 135, --- S.E.2d --- (2000).[FN3]

{116}  In *Chemimetals,* plaintiff Chemimetals Processing, Inc. ("Chemimetals") entered into a contract with Jeffrey McEneny, president of Vibra-Chem Company ("Vibra-Chem") to share profits from the manufacture and sale of chemical compounds.  Pursuant to this agreement McEneny also became president of Chemimetals.  Alleging breach of fiduciary duty, breach of contract and unfair and deceptive trade practices, Chemimetals sued McEneny and Vibra-Chem.  During trial, the parties entered into a settlement agreement in which Chemimetals recovered $600,000 in damages.  After its settlement with McEneny and Vibra-Chem, Chemimetals instituted another action against a CPA firm and members of its board of directors for negligence and breach of fiduciary duty.  Chemimetals alleged that the CPA firm and its directors were at fault for "failing to appreciate Chemimetal's declining economic value due to the improper actions of McEneny."

{117}  The court noted that the settlement agreement between Chemimetals, Vibra-Chem and McEneny did not release the CPA firm, but further stated that "although Chemimetals is entitled to full recovery for its damages, Chemimetals is not entitled to a 'double recovery' for the same loss or injury." *Chemimetals Processing, Inc. v. Schrimsher,* 140 N.C. App. 135, 138, 535 S.E.2d 594, 596 (2000) (quoting *Markam v. Nationwide Mut. Fire Ins. Co.,* 125 N.C. App 443, 455, 481 S.E.2d 349, 357, *disc. rev. denied,* 346 N.C. 281, 487, S.E.2d 551 (1997).   Additionally, the court stated,

Chemimetals has suffered but one injury in this case -- monetary loss due to the purported

diversion of profits and labor from Chemimetals by McEneny. Under the facts as alleged by Chemimetals, all actions in the course of events leading to financial demise of Chemimetals were concurrent. Chemimetals' monetary loss, which was the injury created by McEneny's scheme, is the same injury caused by the alleged failure of the board of directors and CPAs to notice McEneny's unlawful acts. That only one injury occurred is in no way altered by the fact that the board of directors and CPAs may have been guilty of separate wrongdoing. Moreover, in its second complaint against the board of directors and CPAs, Chemimetals seeks recovery for its *actual* losses resulting from the company's decline in income. By entering the $600,000 settlement Chemimetals was compensated for those same losses in the first action, where they were alleged to total $190,786.33. Chemimetals may not assert a second action seeking to collect for those losses against the board of directors and CPAs. *Cf. Knight Publ'g Co v. Chase Manhattan Bank, N.A.,* 137 N.C. App. 27 34, 527 S.E.2d 80, 85 (Wynn, J., dissenting). Accordingly, the trial court properly entered summary judgment in favor of all defendants.

*Id.* at 139, 535 S.E.2d at 596-97.

{118}   The facts in *Chemimetals* are strikingly similar to the those in the case at bar.  Like Chemimetals, the losses PIPM seeks to recover for damages resulting from creation and termination of the CLTs and Foundation are the same losses that were compensated by the Settlement with Philip and the Foundation. Thus, from this event, PIPM may only recover once for its damages.  Even though the settlement agreement between the Foundation, Philip, PIPM and the Doctors does not release P&S or Centura, P&S and Centura are released to the extent that PIPM's or the Doctors' damages as measured by the appropriate standard do not exceed $365,000.

{119}   The Doctors recovered $365,000 for their losses resulting from their reliance on the agreement between PIPM and the Foundation.  The Court has determined as a matter of law the measure of damages for PIPM's and the Doctor's claims against P&S and Centura is not measured by the loss of funding because 1) the Doctors voluntarily waived their right to funding and 2) the causes of action asserted against P&S and Centura do not support damages based upon loss of funding.  Rather, the losses of the Doctors are based upon the fact that but for the actions of P&S and Centura, the Doctors would not have left their employment to work for PIPM.  Based upon that latter standard, if the damages shown do not exceed $365,000, then the Doctors are not entitled to double recovery for the same losses.

{120}   The Court is unable to determine what the PIPM parties allege as damages as measured by the appropriate standard.  Any claim for damages by PIPM or the Doctors must be those expenses incurred as a result of having put PIPM into operation and their reliance on PIPM's operation and does not include expenses incurred after entering into the settlement agreement.  If those damages are less than $365,000, then there can be no claims remaining against Centura and P&S, and this is a final order dismissing all remaining claims.

## VIII.
## Claims Against P&S

{121}   The Court grants summary judgment in favor of P&S on PIPM's claims for breach of fiduciary duty, constructive fraud, breach of contract, breach of third party contract, breach of the rules of professional conduct and damages pursuant to N.C.G.S.§ 84.13.  Conversely, the Court denies summary judgment on PIPM's claims for professional negligence and negligent misrepresentation.

### A.
### The Constructive Fraud Claim Fails

{122}   PIPM's claim for breach of fiduciary duty is essentially a claim for constructive fraud.  *Jay Group Ltd. v. Glasgow,* 139 N.C. App. 595, 600, 534 S.E.2d 233, 237 (2000).  "[T]o maintain a claim of constructive fraud, there must be an allegation that defendant sought to benefit himself." *NationsBank of North Carolina, N.A. v. Parker,* 140 N.C. App. 106, 535 S.E.2d 597 (2000) (citing *Barger v. McCoy*

*Hillard & Parks,* 346 N.C. 650, 666, 488 S.E.2d 215, 224 (1997). PIPM claims "that the motive of P&S . . . was to favor its long-time high-paying client, [Centura], and to protect P&S from a legal malpractice claim once its malpractice was discovered."

{123} This claim must be based upon allegations that P&S knew that Philip Staton had executed his 1993 Durable Power, did not disclose that information to PIPM and benefited from that non-disclosure. PIPM was aware, based on the conflicts waiver letter, that in order for P&S to create the CLTs and the Foundation, it first had to obtain powers of attorneys from the principals. Since P&S did create the entities, PIPM must have believed that P&S obtained these powers. Thus, even if P&S did not affirmatively tell PIPM that it had a signed power of attorney from Philip, PIPM should have known that P&S believed that such a power existed. It is clear that no affirmative misrepresentation about Philip's execution of his 1993 Durable Power was made by P&S. It is also clear that neither PIPM nor its counsel attempted to obtain or review the various powers of attorney before settling with the Statons. It is also undisputed that in March 1996, P&S neither advised PIPM on whether or not to execute the settlement agreement nor provided any legal advice on the validity of the 1993 Durable Powers or the CLTs.

{124} P&S's continued relationship with Centura is not sufficient to establish a benefit conferred on P&S. *See id.* at 114, 535 S.E.2d at 602. "Implicit in this holding is a finding that payment of a fee to a defendant for work done by that defendant does not by itself constitute sufficient evidence that the defendant sought his own advantage in the transaction." *Id.* As to protecting itself from a malpractice claim, even if this motive is sufficient to satisfy a constructive fraud claim, it appears to the Court that West's representations that the CLTs were not authorized certainly put P&S in reach of a malpractice claim; the Court is not aware of any actions done by P&S that could have mitigated this result. Thus PIPM's claim for constructive fraud fails, as its forecast of evidence cannot establish that P&S sought to benefit from the transactions at issue. Consequently, the Court denies damages claimed by PIPM pursuant to N.C.G.S. § 84.13.

## B.
### The Breach of Contract Claim Against P&S Fails

{125} PIPM claims both a breach of contract claim and a breach of third party contract claim for P&S's failure "to perform their legal services to insure proper, adequate and direct funding for PIPM." The services P&S agreed to perform for the various parties are contained in the conflicts waiver letter, which states that P&S would perform the following:

1) Prepare durable powers of attorney for [the Statons].

2) Prepare charitable lead trusts . . . . During their terms, the Trusts will pay annual amounts to a newly established private foundation . . . . [Centura], an existing client of this firm, will be trustee of the [CLTs].

3) Establish the Foundation and obtain appropriate tax determinations of exempt status. The Foundation will be funded by an initial gift from the Statons and will receive annual payments from the [CLTs]. The Foundation will be available to make grants to tax exempt organizations, including the newly established [PIPM].

4) Establish [PIPM] on behalf of three physicians, Drs. Stuart Meloy, Joe Martin, and Nancy Faller . . . and obtain appropriate tax determinations of exempt status. We may also be asked to establish a new for-profit entity to be owned by the Doctors, which will provide services to the Institute.

PIPM argues that had P&S seen to the proper execution of the documents, PIPM would have been guaranteed funding for twenty years. Therefore, PIPM claims damages in excess of $40 million. The Court rejects PIPM's argument on several grounds.

{126} If there existed a direct contract between PIPM and P&S, that contract consisted of P&S's responsibility to establish PIPM and secure its tax-exempt status. This task was accomplished by P&S. Thus, the breach of contract claim is denied on these grounds.

{127} Preparing the durable powers of attorney and the CLTs and establishing the Foundation were tasks performed by P&S for the Statons at the request of Tom Brame. PIPM must therefore prove that it is a third-party beneficiary by showing:

> (1) that a contract exists between two persons or entities; (2) that the contract is valid and enforceable; and (3) that the contract was executed for the direct, and not incidental, benefit of the plaintiff. A person is a direct beneficiary of the contract if the contracting parties intended to confer a legally enforceable benefit on that person. It is not enough that the contract, in fact, benefits the plaintiff, if, when the contract was made, the contracting parties did not intend it to benefit the plaintiff directly. In determining the intent of the contracting parties, the court should consider the circumstances surrounding the transaction as well as the actual language of the contract. When a third person seeks enforcement of a contract made between other parties, the contract must be construed strictly against the party seeking enforcement. [citations omitted].

*Holshouser v. Shaner Hotel Group Props., One Ltd. Pshp.,* 134 N.C. App. 391, 400, 518 S.E.2d 17, 25 (1999). P&S did not have the authority from the Statons to carry out the terms of the contract it negotiated with Tom Brame. In fact, all six lawsuits filed in this case center on the powers of attorney used to create the CLTs and Foundation. This Court has found that neither Tom nor Philip had the authority to make charitable gifts for Inge and that Tom breached his fiduciary duty with respect to both Inge and Philip in relation to the establishment of the CLTs and the Foundation. The Court cannot hold P&S liable for $40 million in damages resulting from a contract that P&S could not enforce. The breach complained of, i.e., the failure to get authorization for the CLTs and Foundation, is the factual basis for the lack of authority to perform on the contract. It would be anomalous to hold P&S liable for breach of a third-party beneficiary contract in this situation.

{128} Further, P&S argues and this Court agrees that P&S never contracted to "*insure* proper, adequate and direct funding for PIPM." (emphasis added). P&S agreed to perform the tasks it identified in the conflicts waiver letter. The language of the conflicts waiver letter makes it clear that P&S's task was to make it possible for the Foundation to fund PIPM; it did not set out to insure that PIPM was in fact funded. Further, the Grant Letter, which represents the contract between the Foundation and PIPM, does not even guarantee PIPM funding. Certainly, P&S did not contemplate that negligence in the performance of any of the tasks in the conflicts waiver letter would result in its being responsible for twenty years of funding for PIPM.

{129} As indicated above, even if PIPM's breach of contract claims survived summary judgment, the damages suffered by PIPM would not be measured by the twenty years of funding PIPM lost due to the termination of the CLTs. The measure of damages in a malpractice action is the difference between PIPM's position at the time of P&S's negligent act and what PIPM's pecuniary position would have been had P&S not erred. *See Smith v. Childs,* 112 N.C. App. 672, 685, 437 S.E.2d 500, 509 (1993). In this case, at the time of the allegedly negligent act, the donors did not authorize the Foundation and the CLTs, and PIPM had no right to funding. If P&S had discovered the flaw in the execution of the powers of attorney, Tom Brame would not have had the authority to create Inge's CLTs and make donations to the Foundation on her behalf. If Tom Brame had not been negligent, had not breached his fiduciary duty to Philip Staton, and had he provided accurate and complete information to his principal, Philip, then the CLTs and Foundation would not have been authorized. Thus PIPM may not claim that, but for the malpractice of P&S, it would be funded for twenty years. All of the evidence supports a finding that if P&S had contacted either Philip Staton or Inge Staton and explained the necessity for the new powers of attorney and the terms of the proposed CLTs, the Statons would not have authorized the creation of the CLTs and Foundation. The alleged negligence of P&S could not be the loss of funding for twenty years.

However, depending on the proof of damages at the trial, the alleged negligence could be the proximate cause of other injuries resulting from the Doctors' reliance on the validity of the CLTs and the Foundation.

{130}   As the Court notes above, PIPM released Philip and Inge Staton as well as the Foundation in the settlement agreement.  It cannot now sue P&S and Centura for funding that it validly relinquished in return for a large cash settlement.[FN4]

{131}   The damages PIPM is entitled to in this situation would be nominal damages and foreseeable damages sustained as a result of creating and dismantling PIPM, not the costs of maintaining PIPM for the life of the CLTs.  The Court further notes that PIPM's claim for professional negligence is sufficient to recover any of the damages PIPM would be allowed under its dismissed breach of contract claims.

## C.
### Rules of Professional Conduct Not A Basis For Civil Liability

{132}   The Court also grants summary judgment in favor of P&S for breach of the rules of professional conduct.  Violations of the rules of professional conduct are not a basis for civil liability.  *See* North Carolina Revised Rules of Professional Conduct, Rule 0.2 ("Scope") (2000); *see also Webster v. Powell,* 98 N.C. App. 432, 439, 391 S.E.2d 204, 208 (1990), *aff'd*, 328 N.C. 88, 399 S.E.2d 113 (1991).

{133}   As to the breach of fiduciary duty, professional negligence and negligent misrepresentation claims, the Court believes that the factual disputes surrounding the events of March 28-30, 1996, and questions surrounding execution of the 1993 Durable Powers are sufficient to deny summary judgment.

## IX.
### PIPM's Claims Against Centura

{134}   The Court grants Centura's motions for summary judgment for breach of fiduciary duty, constructive fraud, fraud, fraudulent misrepresentation and unfair trade practices.  The Court denies summary judgment for the claims of negligent misrepresentation.

## A.
### The Claim For Constructive Fraud Fails

{135}   PIPM's claim for breach of fiduciary duty is essentially a claim for constructive fraud.  *Jay Group Ltd. v. Glasgow,* 139 N.C. App. 595, 600, 534 S.E.2d 233, 237 (2000).  "[T]o maintain a claim of constructive fraud, there must be an allegation that defendant sought to benefit himself."  *NationsBank of North Carolina, N.A. v. Parker,* 140 N.C. App. 106, 535 S.E.2d 597 (2000) (citing *Barger v. McCoy Hillard & Parks,* 346 N.C. 650, 666, 488 S.E.2d 215, 224 (1997).   PIPM claims that Centura benefited from its banking relationship with PIPM.  PIPM's banking relationship with Centura is insufficient to establish a benefit conferred on Centura.  *See id.* at 114, 535 S.E.2d at 602.  "Implicit in this holding is a finding that payment of a fee to a defendant for work done by that defendant does not by itself constitute sufficient evidence that the defendant sought his own advantage in the transaction."  *Id.*  The Court notes that the money used to fund the Foundation and ultimately PIPM already resided at Centura; thus there was no new influx of funds to Centura.  Therefore PIPM's claim for constructive fraud fails, as its forecast of evidence cannot establish that Centura sought to benefit from the transactions at issue.

## B.
### The Claim For Fraud Fails

{136}   To recover for fraud, PIPM must "present evidence tending to show (1) a false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) which was relied upon and resulted in damages to the injured party."  *Pleasant Valley Promenade v. Lechmere, Inc.,* 120 N.C. App. 650, 663, 464, S.E.2d 47, 57 (1995).

"Without the intent to deceive, the required scienter for fraud is not present." *Malone v. Topsail Area Jaycees, Inc.,* 113 N.C. App. 498, 502-503, 439 S.E.2d 192, 195 (1994). "[M]ere evidence of reckless indifference to a representation's truth or falsity is not sufficient to satisfy the element of scienter." *Brandis v. Lightmotive Fatman, Inc.*, 115 N.C. App. 59, 67, 443 S.E.2d 887, 891 (1994) (internal quotation marks omitted); *see also Leftwich v. Gaines*, 134 N.C. App. 502, 507, 521 S.E.2d 717, 722, *rev. denied*, 351 N.C. 357 (1999) (holding that a "mere recommendation or statement of opinion ordinarily cannot be the basis of a cause of action for fraud"). To state a claim for fraud, PIPM must establish that the individual(s) who made the alleged communications or fraudulent omissions possessed the requisite scienter. The PIPM parties cannot meet either the knowledge or intent elements of scienter. The basis of PIPM's fraud claim against Centura is Centura's alleged repeated reassurances to the Doctors when the funding failed to commence in late 1995.

{137} There is no evidence in the record that the officials at Centura were aware of the defects in the powers of attorneys when the Foundation and the CLTs were established. While Centura may have been aware of the Statons' dissatisfaction regarding the CLTs and Foundation, Centura's belief in the validity of the CLTs and Foundation was not unfounded. There is no evidence that Centura intended to deceive PIPM by offering reassurance as to the validity of the Foundation. It was not until the March 1996 meetings that all the parties were made aware of the legal defects surrounding the CLTs and Foundation and the intended actions of the Statons as a result of those defects. Throughout this litigation Centura has consistently stated its belief that the CLTs and Foundation were validly established and has refused repeated requests by the Statons to dismantle the charitable instruments absent a court order. Thus PIPM is unable to prove the scienter required for a basis for fraud.

{138} Secondly, as to the alleged representations or lack of disclosure surrounding the March 1996 meetings, the Court finds that any reliance on Centura by PIPM was not reasonable. To rely reasonably upon a representation for purposes of fraud, a plaintiff must not have had the opportunity to discover the truth of the representations allegedly relied upon. As stated by the Court of Appeals, "when the party relying on the false or misleading representation could have discovered the truth upon inquiry, the Complaint must allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Hudson-Cole Development Corp. v. Beemer*, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999). *Beemer* imposes an affirmative duty upon the PIPM Plaintiffs to investigate, unless PIPM alleges that they were denied that opportunity. The facts indicate and PIPM admits that it did not request any documents from any party, nor did it make inquiries of the Brames. There is no allegation that PIPM was denied access to any information since PIPM did not request any information. Thus, the Court grants summary judgment to Centura on the fraud and fraudulent misrepresentation claims.

## C.
### The Claim For Unfair Trade Practices Fails

{139} "To prevail on a claim of unfair and deceptive trade practice a plaintiff must show (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." *Spartan Leasing Inc. v. Pollard*, 101 N.C. App. 450, 460-61, 400 S.E.2d 476, 482 (1991). A banking "'practice is unfair if it offends established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers,' and 'is considered deceptive if it has the capacity or tendency to deceive.'" *Carlson v. Branch Banking and Trust Co.,* 123 N.C. App. 306, 316, 473 S.E.2d 631, 637-38 (1996) (quoting *Wachovia Bank & Trust Co. v. Carrington Dev. Assoc.,* 119 N.C. App. 480, 487, 459 S.E.2d 17, 21 (1995)).

{140} The acts that PIPM complains are unfair and deceptive seem to be that Centura failed to know that the powers of attorney were not properly executed, reassured the Doctors that the Foundation was validly created and failed to affirmatively disclose the existence of the powers of attorney at the March 1996 meetings. Even if these allegations are true, the actions do not rise to the level of an "immoral, unethical,

oppressive, unscrupulous, or substantially injurious to consumers" practice. Those allegedly negligent acts can hardly be considered a practice, and while it may have affected the parties involved in this litigation, the effect of Centura's acts on the marketplace would be negligible. *See Erler v. Aon Risks Servs., Inc.,* -- N.C. App. --, 540 S.E.2d 65 (2000) (misleading comments limited to plaintiffs insufficient evidence of a practice); *Marlen C. Robb & Son Boatyard & Marina v. Vessel Bristol,* 893 F. Supp. 526 (1994) (one dissatisfied customer not sufficient evidence of practice).

## X.
### Inge & Mercedes' Claims Against PIPM

{141}   Finally, the Court grants summary judgment to PIPM on Inge and Mercedes' claims for conversion. Inge and Mercedes are claiming the $2 million which was removed from the PIM account before the 1993 Durable Powers were signed by Philip and prior to the $365,000 settlement between the Foundation and PIPM.

### A.

{142}   The applicable statute of limitations for conversion is three years. N.C.G.S. § 1-52(4) (2000). Inge and Mercedes' claims for conversion are barred by the statute of limitations. Inge testified in her deposition that she became aware in late December 1995 through her discussions with her accountant, Charles Hirsh, that some of her money had been transferred to the CLTs and ultimately to the Foundation. She then stated that she became aware specifically of PIPM in January 1996. However, it was not until March 1999 that Inge and Mercedes made any demand for payment or charged that PIPM and the Doctors had converted their money. It was not until March 25, 1999, that this action for conversion was filed.

{143}   Reliance on *Hoch v. Young*, 63 N.C. App. 480, 305 S.E.2d 201 (1983) is unfounded in that there was no belief on the part of Inge or Mercedes that PIPM was not claiming complete ownership of the funds. This is not a situation in which the statute of limitations is tolled until the plaintiff demands the return of property and is refused. In this case, Inge and Mercedes had full knowledge in early 1996 that PIPM was given a grant of $2 million, and Inge and Mercedes had a duty to bring their conversion action within three years of acquiring that knowledge.

{144}   Further, the Court concludes that this is not a conversion case. Inge and Mercedes Staton entrusted management of their assets in the United States to Philip and Tom. Both were negligent in the performance of their duties, and Tom breached his fiduciary duty to Inge, Mercedes and Philip. Those failures resulted in the creation of the CLTs and Foundation and expenditures from the CLTs to the Foundation and then to PIPM. Where an innocent third party has benefited from an agent's violation of his obligations to his principal, the innocent third party cannot be held liable for conversion. The principal's claim is against the agent for breach of fiduciary duty. *See Charleston & W. C. R. Co. v. Robert G. Lassiter & Co.,* 207 N.C. 402, 177 S.E. 9 (1934).

It is, therefore, hereby ORDERED, ADJUDGED AND DECREED:

1.   Summary judgment is granted for Philip, Inge and Mercedes;

2.   Summary judgment is granted for P&S on PIPM's and the Doctor's claims for breach of contract, breach of third party contract, breach of fiduciary duty, constructive fraud, breach of the rules of professional conduct, and damages pursuant to N.C.G.S. § 84-13;

3.   Summary judgment is denied for P&S on PIPM's and the Doctor's claims for professional negligence and negligent misrepresentation except as provided in number eight below;

4.   Summary judgment is granted for Centura on PIPM's and the Doctor's claims for breach of fiduciary

duty, constructive fraud, fraud, fraudulent misrepresentation, unfair trade practices and special damages;

5.   Summary judgment is denied for Centura on PIPM's and the Doctor's claims for negligent misrepresentation except as provided in number eight below;

6.   PIPM's request for declaratory judgment is denied; and

7.   Summary judgment is granted to PIPM on all claims asserted by Inge and Mercedes.

8.   With respect to PIPM's claims for damages against Centura and P&S on the professional malpractice and negligent misrepresentation claims remaining, Centura and P&S are granted summary judgment on any damage claim based upon the loss of funding.  Further to the extent any remaining claims for damages do not exceed $365,000, those claims are barred.  Therefore, if PIPM's claims for damages other than loss of funding do not exceed $365,000, P&S and Centura are entitled to summary judgment, and this order would constitute a final order on all claims.  The record is unclear on PIPM's damage claim in that regard so this part of the order is not final unless PIPM concedes its non-funding damages are less than $365,000.

This the 31st day of May 2001.

_____
Ben F. Tennille
Special Superior Court Judge
 for Complex Business Cases

---

[FN1] It should be noted that Dr. Meloy sought to become a partner with Tom and Jerri Brame after PIPM was operating .  In a letter dated October 28, 1995, Dr. Meloy outlined his education and experience and summed up his qualifications  by claiming to be "one of the sharpest minds in the country."  (Exh. 15, Dr. Meloy letter to Brames.)

[FN2] It is worthy of note that after five years of litigation and trial of all the other claims arising out of the Brames' handling of the Panamco sales proceeds, PIPM and the Doctors are the only parties who have received a positive cash flow from what has occurred.  The Brames are bankrupt.  Centura and P&S have paid money to settle claims.  The Statons have all lost money.  Conversely, PIPM received $2 million .  The Doctors all received higher income from the clinic than they were earning before they joined PIPM.  At settlement, the Doctors not only received $365,000 from the Foundation, but they also retained the $425,000 remaining in the PIPM account.

[FN3] This case was published after this Court's "Notice of Preliminary Summary Judgment Decisions."  The Court allowed the parties the opportunity to brief this case for the Court's consideration.

[FN4] Complaint 99-CvS-3178